Kevin ARMSTRONG and Kraig Armstrong, minors, by Roosevelt Savage and Rochelle Savage, their parents and next friends, Mary Lou Hicks and Presten Hicks, minors, by Paul L. Hicks and Rose B. Hicks, their parents and next friends, Jean Robinson, by Alonzo Robinson and Theresa Robinson, their parents and next friends, and Andrew Smith, Grantley H. Smith, and Kermit Smith, minors, by Kenneth L. Smith and Phyllis G. Smith, their parents and next friends, Plaintiffs,

v.

BOARD OF SCHOOL DIRECTORS OF the CITY OF MILWAUKEE, James F. Koneazny, Thomas Brennan, Anthony S. Busalacchi, Margaret Dinges, Gerald P. Farley, Stephen Jesmok, Jr., Marian McEvilly, Maurice J. McSweeney, Edward S. Michalski, Lawrence J. O'Neil, Evelyn T. Pfeiffer, Lorraine M. Radtke, Lois Riley, Doris Stacy, and Leon W. Todd, Jr., Members of the Board of School Directors of the City of Milwaukee, Lee R. McMurrin, Superintendent of Schools of the City of Milwaukee, and Thomas A. Linton, Secretary-Business Manager of the Board of School Directors of the City of Milwaukee, Defendants,

Milwaukee Teachers' Education Association, Undesignated Intervenor.

Civ. A. No. 65-C-173.

United States District Court,
E. D. Wisconsin.

May 4, 1979.

As Amended May 11, 1979.

Decision and Order on Intervention
June 20, 1979.

See also, D.C., 451 F.Supp. 817, 463 F.Supp. 1295, and 471 F.Supp. 800.

Lloyd A. Barbee, Milwaukee, Wis., for named plaintiffs.

Irvin B. Charne, Milwaukee, Wis., for the absent members of the plaintiff classes.

L. C. Hammond, Jr., Patrick W. Schmidt, and Ronald E. Klipsch, Milwaukee, Wis., for defendants.

Curry First, Milwaukee, Wis., for Milwaukee Teachers' Education Assn., undesignated intervenor.

Glenn E. Carr, Milwaukee, Wis., for applicant intervenors on intervention; Nathaniel R. Jones, NAACP Gen. Counsel, New York City, and Louis R. Lucas, Memphis, Tenn., of counsel.

## DECISION AND ORDER ON FACULTY DESEGREGATION REMEDY

REYNOLDS, Chief Judge.

This is an action brought pursuant to 42 U.S.C. § 1983 challenging the defendants' alleged unconstitutional actions in creating and maintaining unlawful racial segregation in the Milwaukee public school system. The court has jurisdiction under 28 U.S.C. § 1343.

In a decision and order issued on June 1, 1978, the Court discussed and made findings of fact about the history of faculty assignments in the Milwaukee public school sys-

tem. *Armstrong v. O'Connell*, 451 F.Supp. 817, 830–836 (E.D.Wis.1978). Based on its findings, the Court concluded at 866 that:

> "F–89. The objective evidence previously described in detail demonstrates that defendants' decisions, at least since 1950, with respect to teacher assignment and transfers, * * * were undertaken with an intent to segregate * * teachers by race. * * * "

In a decision and order issued on February 8, 1979, see *Armstrong v. O'Connell*, 463 F.Supp. 1295 (E.D.Wis.1979), the Court found that the defendants' decisions with respect to teacher assignments and transfers have had a systemwide impact on the Milwaukee public school system, and it concluded at 1309 that:

> "L–3. In order to redress the pervasive, systemwide impact of defendants' constitutional violations, a systemwide remedy encompassing both student population and teacher assignment is required."

The Court today in a companion decision approved a settlement agreement submitted by the plaintiffs and defendants, which agreement sets forth a remedy for the systemwide impact of defendants' constitutional violations on student population. Two separate remedial plans designed to cure the systemwide impact of defendants' constitutional violations on teacher assignments have been submitted to the Court, one by the plaintiffs and defendants jointly (hereinafter the "administration plan") and the other by the undesignated intervenor, the Milwaukee Teachers' Education Association (hereinafter the "MTEA plan"). For the reasons set forth, the Court adopts the administration plan with minor modifications in the provisions for enforcement.*

There are three major differences between the plans. First, the administration plan provides that all school faculties shall be desegregated by the fall of 1979, whereas the MTEA plan provides that five-sixths of the faculties shall be desegregated by the fall of 1979 and the remaining one-sixth by the fall of 1980. Both plans use the same definition of desegregation. Second, the administration plan provides that teachers will be excessed in accordance with the collective bargaining seniority provisions, except where doing so will not help to promote or maintain racial balance, and in the latter case the least senior teacher of the appropriate race will be excessed with a right to return in the event the excessing turns out to have been unnecessary and the return will not negatively affect racial balance; that teachers will be informed of vacancies by May 15, may volunteer to fill vacancies through June 1, and that final assignments will be made prior to commencement of the school year, with mandatory assignments if necessary to reach the desegregation goals; and that a final adjustment will take place after the commencement of the school year if the actual enrollment figures require such an adjustment. The MTEA plan provides that excessing shall occur strictly in accordance with the seniority provisions in the collective bargaining agreement; that teachers may apply for vacancies set forth in a list to be prepared on or about July 1; and that assignments shall be made on a tentative basis until the fourth week of the school year when mandatory reassignment will be used if necessary to meet the desegregation goals. Third and last, with respect to enforcement, the administration plan provides that arbitration provisions in the collective bargaining agreement shall be followed, except that the parties may take matters pertaining to whether or not the goals of the remedial order have been met to a United States Magistrate for review. The MTEA plan provides that all questions arising un-

---

\* The MTEA plan is attached to this decision and order as Appendix A, and the administration plan as Appendix B. The other appendices consist of an amendment to Part IV(B)(3) of the administration plan, submitted by the defendants, see defendants' brief filed March 16, 1979, at 19 (Appendix C); a chart prepared by de-

fendants of the MTEA plan (Appendix D); a chart prepared by defendants of the administration plan (Appendix E); defendants' summary comparison of the teacher desegregation proposals (Appendix F); and the MTEA's summary comparison of the teacher desegregation proposals (Appendix G).

der the remedial order shall be settled by arbitration with the usual right of appeal to the court of the arbitrator's decision.

The MTEA has urged the Court to accept its plan if for no other reason, then because the plan has the support of the teachers and the union. The parties argue that the defendants should have the initial opportunity to devise a constitutionally acceptable remedy and only if they fail should the Court consider an alternative remedy. See, e. g., *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Brown v. Board of Education*, 349 U.S. 294, 299, 75 S.Ct. 753, 99 L.Ed.2d 1083 (1955). Each side, in addition, argues that its plan will be the most effective in curing the present effects of defendants' past unconstitutional actions and departs the least from the terms of the collective bargaining agreement presently in effect.

▮▮▮ The Court recognizes the conflicting interests at stake, and recognizes the significance both of local school board autonomy and of the teachers' role in implementing a remedy and the difference to its effectiveness that their support for the remedy imposed can make. See, e. g., *Morgan v. McDonough*, 456 F.Supp. 1113, 1116 (D.Mass.1978). Nevertheless, the burden is on the court ultimately to impose the remedy which it believes will most effectively cure the effects of the past constitutional violations, *Green v. County School Board of New Kent County*, 391 U.S. 430, 439, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), even if in so doing it must override provisions contained in a collective bargaining agreement. *Morgan v. McDonough*, supra. As stated in *Armstrong v. O'Connell*, 416 F.Supp. 1325, 1340 (E.D.Wis.1976):

" * * * The district court's only legitimate concern is to see to it that the constitutional violation is corrected. As a practical matter, local school officials should have a 'first crack' at coming up with a desegregation remedy, * * *. * * * [I]t has been held that '[o]rdinarily, the court will not substitute its discretion for that of a board of education but will adopt a plan proposed by the board if it fulfills the board's duty to eliminate the effects of past illegal conduct.' (Citation omitted.)

"At the same time, however, the Supreme Court has instructed district courts to consider school board plans 'in light of any alternatives which may be shown as feasible and more promising in their effectiveness.' (Citation omitted.)"

Having duly considered the administration plan and the MTEA plan, and keeping in mind the policy reasons favoring adoption of each, the Court is of the opinion that the administration plan will provide the most effective remedy for the defendants' past constitutional violations with the least disruption to the school system. In face of that decision, the teachers' interests in enforcement of their seniority provisions and in the resolution of disputes through arbitration must give way to the Court's obligation to impose an effective remedy for constitutional violations and to retain the ultimate authority for enforcement of its own remedial order.

The MTEA has presented the Court with no good reason for delaying full implementation of the remedial goals in the fall of 1979. It argues that the grade restructuring which is scheduled to take place in the school system in 1980 will minimize the need for large scale mandatory reassignment of teachers and the consequent disruption within the system during the initial process of meeting the desegregation goals. It presented no figures of its own, however, about the number of teachers that will be affected in the first year if the goals are met, but agreed that defendants' estimate—that approximately twenty-five schools and one hundred to two hundred teachers (out of approximately 5,000) will be affected—is probably correct. The Court regards the effect of reassigning that number of teachers, in addition to the number normally reassigned during the excessing process, as de minimus and furthermore not particularly disruptive. Certainly it would seem to be of little consequence when weighed against the benefits of meet-

ing the desegregation goals in 1979 rather than in 1980. Therefore, the MTEA having failed to give the Court any good reason for delay, the Court accepts the desegregation goals as set forth in the administration plan.

With regard to the implementation of the desegregation goals, the administration plan has one feature in particular which is preferable to its counterpart in the MTEA plan; that is, the administration plan provides that the initial process .of excessing, which takes place on paper during the spring and summer, will take race and not only seniority into account in the initial reassignment of excessed teachers and use them together at the outset to meet the desegregation goals. Only if the excessing process alone fails to achieve the goals will there be a need for mandatory reassignment of teachers, and if there is such a need, the reassignment will occur prior to the start of the school year. The MTEA points out that another adjustment, involving mandatory reassignment, may be required under the administration plan after school has commenced when the enrollment figures become final, and argues that its plan is preferable since it honors the seniority system at the outset and requires a one time only reassignment after enrollment figures have become final, thereby minimizing interference with the collective bargaining agreement provisions.

■ It is the Court's opinion that the administration plan is superior for several reasons despite its interference with the seniority provisions of the collective bargaining agreement. First, by taking race into account at the first step of the implementation process, it may, although probably not the first year, obviate the need for later mandatory reassignment to meet the desegregation goals, and it will at the least minimize the need for mandatory reassignment. Second, by staging the mandatory reassignment process at the end of the summer but prior to commencement of the school year, it minimizes the negative impact upon students which results from the reassignment of teachers after school has commenced. While some reassignment may be required after the start of the school year under the administration plan, it should be less than that which would be required under the MTEA plan where no account of the desegregation goals is taken until school has actually begun. Finally, it must be remembered that no physical changes in teacher location occur until the end of the summer, and, therefore, the excessing procedure, to which the MTEA objects, occurs only on paper until just prior to the start of the school year when the staffing needs, although not final, are relatively settled.

Important as the cooperation of the teachers is to the success of this remedial plan, the impact of the implementation of the plan on the students is at least as important. By requiring that the administration plan desegregation goals are met by the fall of 1979, the Court will ensure that the students do not bear whatever burden there is in meeting the Court's desegregation goals alone (see the companion decision and order issued today), but rather that the effort is shared between teachers and students. By adopting the administration plan, the Court believes that the negative and disruptive consequences of adoption of the goals for students and teachers alike will be minimized and that the effectiveness of the remedies will be maximized.

■ Finally, with regard to enforcement of the teacher desegregation remedy imposed, it is appropriate that the Court retain the authority to enforce its own orders and to ensure that the goals of the remedial plan are met. The order is being issued as the culmination of civil rights discrimination litigation and not as part of a contract dispute resolution. To the extent that it can avoid interfering with the contract existing between the defendants and the MTEA, the Court will do so—hence, Section II of the plan and the provision in Section V which states that the Court's order "shall not be construed in any way to alter or add to the grievance procedure in the MTEA contract." If a dispute arises as to whether or not the goals set forth in the

remedial order are being met, however, that dispute is properly a part of this litigation and is not merely a contract enforcement dispute, and, therefore, it is appropriately a subject for judicial resolution.

The Court has slightly modified the enforcement provisions set forth in the administration plan to make clear that it is not concerned with minor problems which may arise out of the day-to-day implementation and administration of teacher personnel actions. The plan is otherwise adopted in its entirety.

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the foregoing decision shall constitute the Court's findings of fact and conclusions of law on the issue of the appropriate remedy to be imposed to remedy the present systemwide effects of defendants' past constitutional violations with respect to teacher assignments and transfers.

### ORDER

For the foregoing reasons,

IT IS ORDERED that the following faculty desegregation plan is adopted:

### I. GOALS

Commencing with the 1979–80 school year and for each school year during which this order remains in effect, defendants shall assign teachers with the goal of achieving desegregated faculties defined as follows:

(A) At least two-thirds of the schools shall have faculties which are within a plus or minus five percentage points of the percentage that the total number of black teachers is to the total number of teachers within the school system.

(B) At least one-third of the schools shall have faculties which are within a plus or minus ten percentage points of the percentage that the total number of black teachers is to the total number of teachers within the school system.

(C) All schools shall have at least one black teacher.

### II. COLLECTIVE BARGAINING AGREEMENT

Except as modified herein, the provisions of the then effective collective bargaining agreement between the Board of School Directors of the City of Milwaukee and the Milwaukee Teachers Education Association ("MTEA") which is applicable to teachers shall be followed (hereinafter referred to as "MTEA contract"). The term "teacher" as used herein shall include all persons contained in the teachers' bargaining unit of the MTEA contract.

### III. EXCESSING PROCEDURE

If excessing occurs at any time during the pendency of this order, the MTEA contract shall be followed unless to do so would not help to promote or maintain in the school in which the excessing occurs a racial percentage within plus or minus five percentage points of the percentage that the total number of black teachers is to the total number of teachers within the school system. If a teacher excessed in accordance with this procedure would, if returned to the school from which that teacher is excessed, promote or maintain the racial balance of that school, this return will be permitted if accomplished by the end of final fall staffing adjustments.

### IV. IMPLEMENTATION PROCEDURE

(A) All teacher vacancies will be filled in accordance with the MTEA contract unless a transfer or new placement would not help to promote or maintain in the school in which the vacancy exists a racial percentage within plus or minus five percentage points of the percentage that the total number of black teachers is to the total number of teachers within the entire school system. If excessing occurs, excessed teachers will be placed in accordance with the foregoing procedure. If the racial composition of excessed teachers, teachers returning from leave, or new teachers preclude adherence to the foregoing procedure, then they shall be placed in accordance with the MTEA contract, as modified by Section IV(B).

(B) Teacher Assignment Process:

(1) First Step Assignment Process:

Within seven working days after the July 1 preceding each school year during which this order is to be in effect, the Administration shall internally prepare a list of teacher assignments made in accordance with Section IV(A). This list shall be distributed immediately to the MTEA for comment. Any comments which the MTEA desires to make on the list should be returned to the Administration within three working days after its receipt. Within two working days after the administration's receipt of the comments of the MTEA, if any, it shall be determined by the Administration, after consulting with the MTEA, whether the goals of Section I will be achieved through the application of the First Step Assignment Process. If it is determined that this process will achieve the applicable goals, the teacher assignments, as modified as a result of MTEA comments, shall become final assignments and the Administration shall immediately notify all teachers of their respective assignments. If it is determined that this process is insufficient to achieve the applicable goals, the Second Step Assignment Process shall be utilized.

(2) Second Step Assignment Process:

The Second Step Assignment Process shall be used between the end of the First Step Assignment Process and fifteen working days prior to Orientation Day. The criteria specified in Section IV(A) shall be used to fill all vacancies which occur during the just described period of time. On the fifteenth working day prior to the Orientation Day, the Administration shall determine, after consulting with the MTEA, whether the additional assignments made during the Second Step Assignment Process will achieve the goals of Section I. If it is determined that the applicable goals will be achieved, the teacher assignments shall become final assignments, and the administration shall immediately notify all teachers of their respective assignments. If it is determined that this process is insufficient to achieve the applicable goals, the Third Step Assignment Process shall be used.

(3) Third Step Assignment Process:

Within three working days after the Administration determines that it must use the Third Step Assignment Process, it shall prepare a list of (a) the schools needed to reach the goals based upon the schools closest to achieving those goals and which would involve the minimum number of teacher moves, and (b) the mandatory assignments and reassignments from the designated schools which would bring those schools into the goal ranges. In preparing the list of assignments and reassignments, teachers who are required to leave a school will be identified in accordance with the procedures of Section III and pursuant to a method to be devised and determined by joint agreement of the Administration and the MTEA. This list shall then be distributed immediately to the MTEA for comment. Any comments which the MTEA desires to make on the list should be returned to the Administration within two working days after its receipt. Within two working days after the Administration's receipt of the comments of the MTEA, if any, the mandatory teacher assignments, as modified as a result of MTEA comments, and the assignments made pursuant to the First and Second Step Assignment Processes which were unaffected by the Third Step Assignment Process, shall become final assignments, and the Administration shall immediately notify all teachers of their respective assignments.

In the event the Administration and the MTEA cannot reach agreement on the method by which such mandatory assignments are to be made within four working days after it is determined that the Third Step Assignment Process must be used, the method which shall be employed is the following:

The Administration shall pair the schools closest to meeting the goals. The Administration shall then pair the faculties at the paired schools and exchange the least senior teacher from the school closest to meeting the goal who does not contribute to the racial balance of the school with the least

senior teacher in the paired school who does not contribute to the racial balance at the school and who has the same certification. If it is not possible to pair a particular school and/or faculty from the list, the Administration shall pair said school and faculty with a school and faculty which meet the goals set forth herein but which are at the maximum range of the goal and exchange the least senior teacher from the school found not meeting the goals with the least senior teacher in the paired school who will contribute to the racial balance of the school required to meet the goal and who has the same certification.

(C)   Any teacher assignments made after whichever Assignment Process of Section IV(B) is used to meet the goals shall be made in accordance with Section IV(A).

## V.   *MISCELLANEOUS PROVISIONS*

(A)   The percentage that the total number of black teachers is to the total number of teachers within the school system shall be determined based upon the annual official EEO–5 report which is prepared in the spring of each year.  This percentage will be used in determining teacher assignments during the next succeeding school year. The applicable percentage is to be rounded off to the nearest tenth.  A copy of this report shall be provided to the MTEA.

(B)   For purposes of determining the racial percentage of a faculty, all teachers assigned to a particular school or schools shall be counted on a full-time equivalency basis.

(C)   In the event there is a reduction in the Milwaukee Public School System's teacher complement, this order shall not affect the method of teacher layoff.

(D)   On or before the July 1 preceding each school year, the Administration shall determine the number of schools required to meet the applicable goals established in Section I.

(E)   The failure of the MTEA to timely submit to the Administration any comments permitted under Section IV(B) shall constitute a waiver of the right to submit such comments.

(F)   In the event any party believes that the goals set forth in Section I of this order have not been met, and resolution cannot be achieved by the parties, the matter may be presented to the Magistrate who has been appointed to monitor this order for resolution.  Any such presentation shall not extend the time for the accomplishment of any act required by this order.  This order shall not be construed in any way to alter or add to the grievance procedure in the MTEA contract.

(G)   Determinations not to use the Second or Third Step Assignment Processes set forth in Section IV(B) shall also be reviewable by the Magistrate.  Determinations to use the Second or Third Step Assignment Processes shall be final determinations which are not subject to challenge before the Magistrate, an arbitrator, the Court, or any other reviewing person or body.

(H)   All disputes arising under this order, except those set forth in Sections V(F) and (G) above, i. e., noncompliance with Section I of this order and determinations regarding the use or nonuse of the Second or Third Step Assignment Processes set forth in Section IV(B), shall not be reviewable by the Magistrate or the Court, but rather shall be resolved in a manner consistent with the MTEA contract.

IT IS FURTHER ORDERED that United States Magistrate Ruth W. LaFave is appointed to monitor this order in the manner set forth above in Sections V(F) and (G) of the order.

## APPENDIX A

### FACULTY DESEGREGATION PLAN SUBMITTED BY MTEA

I.  *Goals*

  A.  Definition of a desegregated faculty for fall, 1979:

    1.  At least two thirds (⅔) of the schools would meet the goal of desegregating the faculties when the faculties in those schools are within a

plus (+) or minus (−) five (5) percentage points of the percentage that the total number of black teachers is to the total number of teachers within the school system.

2. At least one sixth (⅙) of the schools would meet the goal of desegregating the faculties when the faculties in those schools are within a plus (+) or minus (−) ten (10) percentage points of the percentage that the total number of black teachers is to the total number of teachers within the school system.

B. Definition of a desegregated faculty for fall, 1980, 1981, 1982, 1983:

1. At least two thirds (⅔) of the schools would meet the goal of desegregating the faculties when the faculties in those schools are within a plus (+) or minus (−) five (5) percentage points of the percentage that the total number of black teachers is to the total number of teachers within the school system.

2. At least one third (⅓) of the schools would meet the goal of desegregating the faculties when the faculties in those schools are within a plus (+) or minus (−) ten (10) percentage points of the percentage that the total number of black teachers is to the total number of teachers within the school system.

II. *Collective Bargaining Agreement*

Except as modified herein, the provisions of the effective collective bargaining agreement between the Board of School Directors of the City of Milwaukee and the Milwaukee Teachers' Education Association (MTEA) which is applicable to teachers shall be followed. The term "teacher" shall include any person contained in the teachers' bargaining unit which is recognized in the collective bargaining contract between the Board of School Directors of the City of Milwaukee and the MTEA.

III. *Implementation Procedure*

A. All teacher vacancies will be filled in accordance with contractual provisions unless a transfer or new placement would not help to promote in the school in which the vacancy exists a racial percentage within plus (+) or minus (−) five (5) percentage points of the percentage that the total number of black teachers is to the total number of teachers within the entire system. If excessing occurs, excessed teachers will be placed in accordance with the foregoing procedure. If the racial composition of excessed teachers, teachers who have not been placed because of a school closing, teachers returning from leave, or new teachers precludes adherence to the foregoing procedure, then they shall be placed in accordance with contractual provisions.

B. Teacher Assignment Process:

1. First Step Assignment Process: A list of teacher vacancies shall be sent to all teachers within five (5) working days after July 1 or the date on which Milwaukee Public School students have been assigned to their respective schools for the school year, whichever date comes later. Within twelve (12) days after the date upon which the teacher vacancy list is mailed, teachers applying for vacancies known by July 1 or by the date on which the general assignment of students to schools occurs, whichever date comes later, shall submit to the Milwaukee Public School Administration (hereinafter referred to as Administration) their applications for assignment or reassignment. Within three (3) working days after teacher applications are returned, tentative assignments shall be processed and listed in accordance with paragraphs III A and B(1). The results of this process and the list of tentative assignments shall be distributed immediately to the MTEA for comment. Any comments which the MTEA desires to make on the list should be

returned to the Administration within three (3) working days after its receipt. Within two (2) working days after the Administration's receipt of the comments of the MTEA, if any, after consulting with the MTEA, it shall be determined by the Administration whether the applicable goals of Section I will be achieved through the application of the First Step Assignment Process. If it is determined that this process will achieve the applicable goals, the teacher assignments, as modified as a result of MTEA comments, shall become tentative teachers of their respective assignments. If it is determined that this process is insufficient to achieve the applicable goals, the First Step Assignment Process assignments shall remain and the Second Step Assignment Process in III B(2) shall be utilized to the extent necessary to meet the goal.

2. Second Step Assignment Process: The Second Step Assignment Process shall be used between the end of the First Step Assignment Process and fifteen (15) working days prior to Orientation Day. The criteria specified in paragraph III A shall be used to fill all vacancies which occur during the just described period of time. On the fifteenth working day prior to Orientation Day, the Administration shall determine, after consulting with the MTEA, whether the additional assignments made during the Second Step Assignment Process will achieve the applicable goals. If it is determined that the applicable goals will be achieved, the teacher assignments shall become tentative assignments and the Administration shall immediately notify all teachers of their respective assignments. If it is determined that this process might be insufficient to achieve the applicable goals, the Second Step Assign-

ment Process assignments shall remain and the Third Step Assignment Process in III B(3) shall be utilized to the extent necessary to meet the goal.

3. Third Step Assignment Process: After the normal staffing adjustments in September based on the final approved teacher needs reports during each year this order is in effect, the Administration shall, within one (1) day, determine whether the applicable goals have been achieved after consulting with the MTEA. If the Administration determines that it must use the Third Step Assignment Process, it shall, within one (1) day, prepare a list of the schools not meeting the goals. The Administration shall then pair the faculties at the paired schools and exchange the least senior teacher from the school closest to meeting the goal who does not contribute to the racial balance of the school with the least senior teacher in the paired school who does not contribute to the racial balance at the school and who has the same certification.

If during each year this order is in effect, it is not possible to pair a particular school and/or faculty from the list, the Administration shall pair said school and faculty with a school and faculty which meets the goals set forth herein but which is at the maximum range of the goal and exchange the least senior teacher from the school found not meeting the goals with the least senior teacher in the paired school who will contribute to the racial balance of the school required to meet the goal and who has the same certification.

IV. *Miscellaneous Provisions*

A. The percentage that the total number of black teachers is to the total number of teachers within the school system shall be determined based

upon the annual official EEO–5 report which is prepared in the spring of each year. This percentage will be used in determining teacher assignments during the next succeeding school year. The applicable percentage is to be rounded off to the nearest tenth. A copy of this report shall be provided to the MTEA.

B. For purposes of determining the racial percentage of a faculty, all teachers assigned to a particular school or schools shall be counted on a full-time equivalency basis.

C. In the event there is a reduction in the Milwaukee Public School System's teacher complement, the special provisions established in this order shall not affect the order in which teachers are laid off.

D. The provisions of this order shall be an amendment to the collective bargaining agreement between the Board of School Directors of the City of Milwaukee and the MTEA and shall be in full force and effect as binding on the parties through and including the 1983–84 school year.

In the event Plaintiffs believe that the Board or the MTEA have not complied with the goals for faculty desegregation as set forth in this Order, they shall have the right to submit such allegation in writing to said parties. If the allegation has not been satisfactorily discussed and resolved within ten (10) days of submission, the Plaintiffs shall have the right to invoke arbitration or to participate therein if the parties have already invoked arbitration under the MTEA contract.

Plaintiffs role in arbitration under this Order shall be limited to issues relating to compliance with the goals for faculty desegregation as set forth in this Order.

E. On or before the July 1 preceding each school year, the Administration shall determine the number of schools in the system.

## APPENDIX B

## FACULTY DESEGREGATION

### I. GOALS

Commencing with the 1979–80 school year and for each school year during which this order remains in effect, defendants shall assign teachers with the goal of achieving desegregated faculties defined as follows:

(A) At least two-thirds (⅔rds) of the schools shall have faculties which are within a plus (+) or minus (−) five (5) percentage points of the percentage that the total number of black teachers is to the total number of teachers within the school system.

(B) At least one-third (⅓rd) of the schools shall have faculties which are within a plus (+) or minus (−) ten (10) percentage points of the percentage that the total number of black teachers is to the total number of teachers within the school system.

(C) All schools shall have at least one (1) black teacher.

### II. COLLECTIVE BARGAINING AGREEMENT

Except as modified herein, the provisions of the then effective collective bargaining agreement between the Board of School Directors of the City of Milwaukee and the Milwaukee Teachers Educational Association ("MTEA") which is applicable to teachers shall be followed (hereinafter referred to as "MTEA contract"). The term "teacher" as used herein shall include all persons contained in the teachers' bargaining unit of the MTEA contract.

### III. EXCESSING PROCEDURE

If excessing occurs at any time during the pendency of this order, the MTEA con-

tract shall be followed unless to do so would not help to promote or maintain in the school in which the excessing occurs a racial percentage within plus ( + ) or minus (–) five (5) percentage points of the percentage that the total number of black teachers is to the total number of teachers within the school system. If a teacher excessed in accordance with this procedure would, if returned to the school from which that teacher is excessed, promote or maintain the racial balance of that school, this return will be permitted if accomplished by the end of final fall staffing adjustments.

IV. IMPLEMENTATION PROCEDURE

(A) All teacher vacancies will be filled in accordance with the MTEA contract unless a transfer or new placement would not help to promote or maintain in the school in which the vacancy exists a racial percentage within plus ( + ) or minus (–) five (5) percentage points of the percentage that the total number of black teachers is to the total number of teachers within the entire school system. If excessing occurs, excessed teachers will be placed in accordance with the foregoing procedure. If the racial composition of excessed teachers, teachers returning from leave or new teachers preclude adherence to the foregoing procedure, then they shall be placed in accordance with the MTEA contract, as modified by section IV.(B).

(B) Teacher Assignment Process:

(1) First Step Assignment Process: Within seven (7) working days after the July 1 preceding each school year during which this order is to be in effect, the Administration shall internally prepare a list of teacher assignments made in accordance with paragraph IV.(A). This list shall be distributed immediately to the MTEA for comment. Any com-

ments which the MTEA desires to make on the list should be returned to the Administration within three (3) working days after its receipt. Within two (2) working days after the Administration's receipt of the comments of the MTEA, if any, it shall be determined by the Administration, after consulting with the MTEA, whether the goals of section I. will be achieved through the application of the First Step Assignment Process. If it is determined that this process will achieve the applicable goals, the teacher assignments, as modified as a result of MTEA comments, shall become final assignments and the Administration shall immediately notify all teachers of their respective assignments. If it is determined that this process is insufficient to achieve the applicable goals, the Second Step Assignment Process shall be utilized.

(2) Second Step Assignment Process:

The Second Step Assignment Process shall be used between the end of the First Step Assignment Process and fifteen (15) working days prior to Orientation Day. The criteria specified in paragraph IV.(A). shall be used to fill all vacancies which occur during the just described period of time. On the fifteenth working day prior to Orientation Day, the Administration shall determine, after consulting with the MTEA, whether the additional assignments made during the Second Step Assignment Process will achieve the goals of section I. If it is determined that the applicable goals will be achieved, the teacher assignments shall become final assignments and the Administration shall immediately notify all[1] teachers of their respective assignments. If it is determined that this process is insufficient to achieve the applicable goals,

the Third Step Assignment Process shall be used.

(3) Third Step Assignment Process: Within three (3) working days after the Administration determines that it must use the Third Step Assignment Process, it shall prepare a list of (a) the schools needed to reach the goals based upon the schools closest to achieving those goals and which would involve the minimum number of teacher moves and (b) the mandatory assignments and reassignments from the designated schools which would bring those schools into the goal ranges. In preparing the list of assignments and reassignments, teachers who are required to leave a school will be identified in accordance with the procedures of section III., and pursuant to a method to be devised and determined by the Administration, after consultation with the MTEA. This list shall then be distributed immediately to the MTEA for comment. Any comments which the MTEA desires to make on the list should be returned to the Administration within two (2) working days after its receipt. Within two (2) working days after the Administration's receipt of the comments of the MTEA, if any, the mandatory teacher assignments, as modified as a result of MTEA comments, and the assignments made pursuant to the First and Second Step Assignment Processes which were unaffected by the Third Step Assignment Process, shall become final assignments and the Administration shall immediately notify all teachers of their respective assignments.

(C) Any teacher assignments made after whichever Assignment Process of section IV.(B). is used to meet the goals, shall be made in accordance with paragraph IV.(A).

## V. MISCELLANEOUS PROVISIONS

(A) The percentage that the total number of black teachers is to the total number of teachers within the school system shall be determined based upon the annual official EEO–5 report which is prepared in the spring of each year. This percentage will be used in determining teacher assignments during the next succeeding school year. The applicable percentage is to be rounded off to the nearest tenth. A copy of this report shall be provided to the MTEA.

(B) For purposes of determining the racial percentage of a faculty, all teachers assigned to a particular school or schools shall be counted on a full-time equivalency basis.

(C) In the event there is a reduction in the Milwaukee Public School System's teacher complement, this order shall not affect the method of teacher layoff.

(D) On or before the July 1 preceding each school year, the Administration shall determine the number of schools required to meet the applicable goals established in section I.

(E) In the event any party believes that the faculty desegregation portions of this order have not been properly complied with, and resolution cannot be achieved by the parties, the matter may be presented to the Magistrate who has been appointed to monitor this order for resolution. Any such presentation shall not extend the time for the accomplishment of any act required by this order. This order shall not be construed in any way to alter or add to the grievance procedure in the MTEA contract.

(F) The failure of the MTEA to timely submit to the Administration any comments permitted under section IV.(B). shall constitute a waiver of the right to submit such comments.

(G) Determinations not to use the Second or Third Step Assignment Processes

shall be reviewable by the Magistrate. Determinations to use the Second or Third Step Assignment Processes shall be final determinations which are not subject to challenge before the Magistrate, an arbitrator, the Court or any other reviewing person or body.

## APPENDIX C

IV.(B)(3)  *Third Step Assignment Process:*

Within three (3) working days after the Administration determines that it must use the Third Step Assignment Process, it shall prepare a list of (a) the schools needed to reach the goals based upon the schools closest to achieving those goals and which would involve the minimum number of teacher moves and (b) the mandatory assignments and reassignments from the designated schools which would bring those schools into the goal ranges. In preparing the list of assignments and reassignments, teachers who are required to leave a school will be identified in accordance with the procedures of section III., and pursuant to a method to be devised and determined by joint agreement of the Administration and the MTEA. This list shall then be distributed immediately to the MTEA for comment. Any comments which the MTEA desires to make on the list should be returned to the Administration within two (2) working days after its receipt. Within two (2) working days after the Administration's receipt of the comments of the MTEA, if any, the mandatory teacher assignments, as modified as a result of MTEA comments, and the assignments made pursuant to the First and Second Step Assignment Processes which were unaffected by the Third Step Assignment Process, shall become final assignments and the Administration shall immediately notify all teachers of their respective assignments.

In the event the Administration and the MTEA cannot reach agreement on the method by which such mandatory assignments are to be made within four (4) working days after it is determined that the Third Step Assignment Process must be used, the method which shall be employed is the following:

The Administration shall pair the schools closest to meeting the goals. The Administration shall then pair the faculties at the paired schools and exchange the least senior teacher from the school closest to meeting the goal who does not contribute to the racial balance of the school with the least senior teacher in the paired school who does not contribute to the racial balance at the school and who has the same certification. If it is not possible to pair a particular school and/or faculty from the list, the Administration shall pair said school and faculty with a school and faculty which meets the goals set forth herein but which is at the maximum range of the goal and exchange the least senior teacher from the school found not meeting the goals with the least senior teacher in the paired school who will contribute to the racial balance of the school required to meet the goal and who has the same certification.

## APPENDIX D

MTEA PLAN

|  | 1ST STEP | | | | 2ND STEP | | | | | 3RD STEP * | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| July 1 | July 6 | July 18 | July 23 | July 26 | July 30 | August 10 | August 27 | August 31 | September 4 | October 1 | October 3 | October 12 |
|  | Mail vacancy lists to all teachers. | Applications for assignment and re-assignment received. | Tentative assignments list prepared. | MTEA comments due. | Determine if goals are met. If so, assignments become tentative and teachers are notified. If not, go to second step. | Determine if goals are met. If so, assignments become tentative and teachers are notified. If not, teachers notified anyway and go to third step. | Inservice Begins | Organization Day | School Starts | Fall Staffing adjustments completed. | Mandatory assignments necessary to meet goals completed. | 6-week report card day. |

* GOALS ACHIEVED

# APPENDIX E

## PLAINTIFFS' AND DEFENDANTS' PLAN

| 1ST STEP | | | 2ND STEP | | 3RD STEP | | | * | MAINTENANCE PROGRAM | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| July 1 | July 10 | July 13 | July 17 | August 10 | August 15 | August 17 | August 21 | August 22 | August 27 | August 31 | September 4 | October 1 | October 12 |
| | Tentative Assignments list prepared. | MTEA comments due. | Determine if goals are met. If so, assignments become final and teachers notified. If not, go to second step. | Determine if goals are met. If so, assignments become final and teachers notified. If not, go to third step. | Mandatory assignment list prepared. | MTEA comments due. | Assignments finalized and mailed to teachers. | Teachers receive assignment notices. | Inservice Begins | Organization Day | School Starts | Fall staffing adjustments completed. | 6-week report card day. |

\* GOALS ACHIEVED

# APPENDIX F

## SUMMARY COMPARISON OF TEACHER DESEGREGATION PROPOSALS

| Issue | Plaintiffs' and Defendants' Proposal | MTEA Proposal | Difference |
|---|---|---|---|
| GOALS | All schools are to be de-segregated (two-thirds within plus or minus five percentage points of the system black teacher percentage and one-third within plus or minus ten percentage points) as of the fall of the 1979–80 school year. All schools must have a minimum of one black faculty member. | All schools are to be de-segregated (two-thirds within plus or minus five percentage points of the system black teacher percentage and one-third within plus or minus ten percentage points) as of the fall of the 1980–81 school year. For 1979–80, two-thirds of the schools must have faculties within plus or minus five percentage points of the system black faculty percentage and one-sixth of the schools must be within plus or minus ten percentage points. | All schools will have "desegregated" faculties by this fall under plaintiffs' and the defendants' proposal. Under the MTEA's proposal, all schools will have "desegregated" faculties by the fall of 1980–81 and one-sixth of the faculties will not be "desegregated" this fall. |
| GOALS LANGAUGE | The schools "shall have" desegregated faculties. | The schools "would meet" the goals of having desegregated faculties. | Plaintiffs and defendants see no practical difference in the language. The MTEA believes their language |

| Issue | Plaintiffs' and Defendants' Proposal | MTEA Proposal | Difference |
|---|---|---|---|
| INTERRELATIONSHIP WITH COLLECTIVE BARGAINING AFREEMENT | The contract should control except as modified by the Court Order. | | provides the necessary flexibility to avoid extremely harsh and unintended consequences involving possible layoffs. |
| EXCESSING * PROCEDURE | All exercising of teachers will follow contractual seniority provisions unless to do so will not help to promote or maintain racial balance. If, however, a teacher who has been excessed could return to the school which he or she left and promote or maintain racial balance, this return will be permitted. | The contract should control except as modified by the Court Order.<br><br>All excessing of teachers will follow present contractual seniority provisions. | None.<br><br>Plaintiffs' and defendants' places racial controls as well as seniority controls on which teachers leave a school due to excessing. The MTEA's has only seniority controls. |
| IMPLEMENTATION PROCEDURE GENERALLY | A three step implementation procedure culminating in mandatory assignments if necessary will be utilized. | A three step implementation procedure culminating in mandatory assignments is necessary will be utilized. | None. |
| TIMING OF IMPLEMENTATION | The assignment process will be completed and the racial balance goals achieved prior to the commencement of each school year. | The assignment process will be completed in the middle of the fifth week of school in each school year. | Plaintiffs' and defendants' has the goals met before school starts. The MTEA's has the goals met in the fifth week of school. |
| NOTIFICATION OF VACANCIES | Present contract is followed. Teachers are informed of vacancies on May 15 and may volunteer for these vacancies by June 1. Applications received by June 1 are honored for all vacancies known by July 1. | Teachers are mailed a vacancy list within five days after July 1, and they may volunteer for these vacancies within twelve days after the mailing. | Plaintiffs' and defendants' would have all transfer applications received by June 1. The MTEA proposal would provide a longer time for volunteering, but applications would not be received until approximately July 16. |
| IMPLEMENTATION PROCEDURE SPECIFICALLY | All vacancies are to be filled in accordance with the contract unless to do so would not help to promote or maintain racial balance within ± 5% points of the system black percentage. Teachers should nevertheless be placed if their racial composition precludes adherence to the above. | All vacancies are to be filled in accordance with the contract unless to do so would not help to promote racial balance within ± 5% points of the system black percentage. Teachers nevertheless be placed if their racial composition precludes adherence to the above. | None, except plaintiffs' and defendants' says "promote or maintain" and the MTEA's says "promote" only. Plaintiffs and defendants feel that the "or maintain" addition clarifies the intent of this language and adheres to the present practice. |
| NATURE OF ASSIGNMENTS | The present contract would be followed with all assignments becoming "final" prior to the commencement of each school year with the exception of those assignments of teachers who have been excessed and whose return to the school which he or she left would help to promote or maintain racial balance. | All assignments are considered to be "tentative" until after the third week of school. This has been the practice under previous Court orders. | Plaintiffs' and defendants' would minimize teacher movement after school opens, but would permit movement if racial balance would be promoted or maintained. The MTEA's would permit teacher movement after the third week of school without regard to racial balance. |

---

* "Excessing" is where a teacher or teachers are "excessed" from a building due to a reduction in enrollment or change in program.

| Issue | Plaintiffs' and Defendants' Proposal | MTEA Proposal | Difference |
|---|---|---|---|
| GRIEVANCE PROCEDURE | The present contract would be followed but in addition the parties could take matters pertaining to the implementation of the Court order to the Magistrate. | All questions concerning faculty assignments under the Court order would be reviewable in the first instance through the collective bargaining grievance procedure which ends with arbitration. Plaintiffs could be involved only to the extent a grievance concerned the goals of faculty desegregation under the Court order. | Plaintiffs' and defendants' would provide two forums for review (arbitration and Magistrate) of implementation of the Court order was involved, otherwise the contract (arbitration) would control. The MTEA's would only provide for arbitration with review by the Court under the normal limited review standard, and plaintiffs' involvement would be restricted to questions concerning the goal of faculty desegregation. |

# APPENDIX G

## I.  GOALS FOR FACULTY DESEGREGATION

| Issue | MTEA Plan | Plaintiffs Defendants Plan | Affect or Difference |
|---|---|---|---|
| 1.  11–21% black faculty— 1979 | ⅔ of schools | ⅔ of schools | Same. |
|  6%–26% black faculty— 1979 | ⅙ of schools | ⅓ of schools | ⅙. |
|  6%–26% black faculty— 1980–1984 | ⅓ of schools | ⅓ of schools | Same. |
| 2.  Implementation flexibility | "would" | "shall" | Defendants agree with MTEA position. (See Defendants memorandum pp. 6–7) |
| 3.  Minimum one black teacher per school | No provision | 1979 required | As a practical matter no difference 1980 through 1984. |

## II.  MANDATORY TEACHER MOVEMENT TO ACHIEVE RACIAL BALANCE

| Issue | MTEA Plan | Plaintiffs Defendants Plan | Affect or Difference |
|---|---|---|---|
| 1.  Should there be mandatory movement to achieve racial balance? | Yes. | Yes. | Same. |
| 2.  When would mandatory movement be triggered? | Final step of staffing process each year. | First step of staffing process each year. | Plaintiffs Defendants based on spring projections and estimates. MTEA based on actual student enrollments and administration's September final teacher needs report. |

III. IMPLEMENTATION PROCEDURES COMPARED

| Issue | MTEA Plan | Plaintiffs Defendants Plan | Affect or Difference |
|---|---|---|---|
| First Step | Notice, Application and Assignment completed by July 30. | Notice, Application and Assignment completed by July 17. | Essentially the same. |
| Second Step | July 30 to August 10 process is the same as Plaintiffs Defendants. | July 17 to August 10 process is the same as MTEA. | The same. Slight difference in dates. |

Informational Note: From opening day of school to the third Friday of September, there is a "shakedown period" used to determine actual student enrollment and determine actual staffing needs for each school. School staffs are then adjusted. Note Defendants memorandum of 3/16/79, p. 16 and App. A.

| Issue | MTEA Plan | Plaintiffs Defendants Plan | Affect or Difference |
|---|---|---|---|
| Third Step | October 1-3 after fall staffing adjustments are finalized and mandatory assignments are made to complete faculty desegregation based on student enrollments. | August 15-21 mandatory removal and final assignment to achieve racial balance. | MTEA—Faculty removal and assignments based on actual student enrollment is completed. Plaintiffs Defendants—Removal and assignments based on projected student enrollment made in the spring. |
| Fourth Step | None. Completes at Step 3. | October 1—staffing removal and assignment adjustments based on actual student enrollments. | MTEA—Completed at Step 3 on October 3. Plaintiffs Defendants — Completed at Fourth Step on October 1. |

IV. IMPLEMENTATION PROCEDURE

| Issue | MTEA Plan | Plaintiffs Defendants Plan | Affect or Difference |
|---|---|---|---|
| 1. Should the final pairing or mandatory step take place before students report to schools? | No. | Yes. | Plaintiffs Defendants—Mandatory removal and assignment based on race and disregarding seniority is done in August on basis of projections. MTEA — Mandatory removal and assignment based on race and seniority is done on basis of actual student enrollment and after all vacancies are filled so as to enhance racial balance. |
| 2. Should mandatory removal and assignment to achieve racial balance be accomplished by pairing schools? | Yes. | Plaintiffs—No. Defendants—Yes. | Defendants adopted MTEA approach in Memorandum dated 3/16/79, p. 19. |

### V. ENFORCEMENT MECHANISM

| MTEA Plan | Plaintiffs Defendants Plan | Affect or Difference |
|---|---|---|
| —Arbitration reviewable by this Court. | —Arbitration for contract violations | *MTEA*—Single, prompt mechanism for dispute resolution. |
| —Plaintiffs have direct access to entire process on an expedited basis. | —Magistrate for violations of Order | *Plaintiffs Defendants*—Dual machinery for dispute resolution. |

## DECISION AND ORDER ON INTERVENTION

The above-entitled action is before the Court on an amended motion for leave to intervene for purposes of seeking an order vacating the settlement agreement previously approved by the Court or, in the alternative, for purposes of prosecuting an appeal from the judgment entered on May 11, 1979. The motion is brought by eleven minors--Jeffrey Jackson, Christopher Jackson, Julie Jackson, Denita Carter, Kenneth Carter, Tyrone Carter, Elston Hortman, Susan McKay, Dwayne McKay, Katishka Jones, and Marshelle Jones--by their parents and next friends Carolyn Jackson, Janet Carter, Lullie Hortman, Pauline McKay, and Kathryn Jones. Simultaneously with the amended motion, the intervenors filed an amended notice of protective appeal to the United States Court of Appeals for the Seventh Circuit. The motion is denied because the Court has no jurisdiction to grant it at this time.

█ While intervention pursuant to Rule 24 of the Federal Rules of Civil Procedure may be permitted by the district court even after judgment has been entered, 7A Wright & Miller Federal Practice and Procedure § 1916 at 582-583; *Romasanta v. United Airlines, Inc.*, 537 F.2d 915, 922 (7th Cir. 1976), aff'd sub nom. *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 97 S.Ct. 2464, 52 L.Ed.2d 423 (1972), once a timely notice of appeal is filed, jurisdiction over all matters pertaining to the appeal passes to the court of appeals, and the district court is without authority to act further with regard to those matters, 9 Moore's Federal Practice ¶ 203.11 at 734 (2d ed. 1975); *Miller v. United States*, 114 F.2d 267, 269 (7th Cir. 1940), cert. denied 313 U.S. 591, 61 S.Ct. 1114, 85 L.Ed. 1545 (1941); *Elgen Manufacturing Corporation v. Ventfabrics, Inc.*, 314 F.2d 440 (7th Cir. 1963), including motions to intervene, 3B Moore's Federal Practice ¶ 24.13[1] at 24-528; *Rolle v. New York City Housing Authority*, 294 F.Supp. 574 (S.D.N.Y.1969); *Associated General Contractors of California v. Secretary of Commerce of the United States Department of Commerce*, 77 F.R.D. 31, 33 (C.D.Cal.1977); *Halderman v. Penhurst State School and Hospital*, 452 F.Supp. 867 (E.D.Pa.1978).

It is not the Court's intention in denying the motion to impede in any way the plaintiff-intervenors' appeal of the settlement. Therefore, the Court specifically finds that their intervention would not prejudice the rights of existing parties to the litigation and would not substantially interfere with the orderly processes of this Court. See 7A Wright & Miller, supra, § 1916. Were it within the Court's authority, therefore, it would grant to the individual plaintiff-intervenors the right to intervene as named plaintiffs for purposes of prosecuting the appeal.

The Court would not, however, grant their request to intervene as representative of a subclass of dissenting plaintiff class members, nor would it grant their request to vacate the settlement agreement. For the reasons previously set forth in the decision and order issued on May 4, 1979, the Court believes that the settlement was and is reasonable and in the best interests of plaintiff class members. As for plaintiff-intervenors' request to represent a subclass of all dissenting class members, in *Research Corporation v. Asgrow Seed Company*, 425 F.2d 1059, 1060 (7th Cir. 1970), the Court stated:

> "Judgments rendered in class actions conducted under Fed.R.Civ.P. 23(b)(1) and (b)(2) will bind non-party class members, [citation omitted] including persons who have intervened or objected, [citation omitted]. In order to insure that the interests of non-party class members are protected, Fed.R.Civ.P. 23(3) requires notice to class members of a proposed settlement or compromise and court aproval of settlements or dismissals. If a class member intervenes or even appears in response to a notice pursuant to Fed.R. Civ.P. 23 (e) and objects to the dismissal or compromise, [citation omitted] he has a right to appeal from an adverse final judgment. J. Moore, 3B Federal Practice ¶ 23.80[5] at 23–1557 (2d Ed. 1969). However, in order to encourage or even to permit settlement, a person in disagreement with the terms of a settlement must take, at least, these minimal steps to preserve his right to appeal. * * *"

Since those persons who did not appear and object or file written objection to the settlement agreement have no right to appeal from the judgment incorporating the settlement agreement, see also 7A Wright & Miller Federal Practice and Procedure § 1797 at 232–233, they do not constitute a proper class for purposes of prosecuting an appeal.

Despite this Court's lack of jurisdiction to pass on the merits of the plaintiff-intervenors' motion, it may well be that the plaintiff-intervenors, or at least the plaintiff-intervenors Jeffrey Jackson, Christopher Jackson, and Julie Jackson, by their parent Carolyn Jackson who appeared and objected at the hearing on the proposed settlement agreement, may appeal from the judgment without formal intervention. See *Research Corporation v. Asgrow Seed Company*, supra. In any case, they may move in the court of appeals for leave to intervene as plaintiffs in this action. *Hurd v. Illinois Bell Telephone Company*, 234 F.2d 942 (7th Cir. 1956). Also, their amended notice of protective appeal was timely filed, and therefore the issue of their standing to prosecute the appeal is now before the United States Court of Appeals for the Seventh Circuit.

For the foregoing reasons,

IT IS ORDERED that the motion of the plaintiff-intervenors filed June 11, 1979, is denied on the ground that this Court is without jurisdiction to grant the motion.