616 F.2d 305
 Kevin ARMSTRONG et al., Plaintiffs-Appellees,
and
Jeffrey Jackson et al., Intervening Plaintiffs-Appellants,
v.
BOARD OF SCHOOL DIRECTORS OF the CITY OF MILWAUKEE et al.,
Defendants- Appellees,
and
Milwaukee Teachers' Education Association, Intervening Defendant.
 No. 79-1655.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 9, 1979.
Decided Feb. 19, 1980.
Rehearing and Rehearing In Banc Denied April 28, 1980.
 
 Thomas I. Atkins, Atkins & Brown, Boston, Mass., for intervening plaintiffs-appellants.
 Lloyd A. Barbee, Milwaukee, Wis., for plaintiffs-appellees.
 L. C. Hammond, Quarles & Brady, Milwaukee, Wis., for defendants-appellees.
 Before SPRECHER and CUDAHY, Circuit Judges, and DUMBAULD, Senior District Judge.*
 SPRECHER, Circuit Judge.
 
 
 1
 The issue in this appeal is whether the district court properly approved a settlement agreement terminating the Milwaukee public school desegregation class action after fifteen years of litigation. The intervening class members, the appellants here, contend that the district court failed to apply the correct standard in its evaluation of the settlement agreement. We conclude that the district court acted properly and affirm.
 
 
 2
 * The original complaint in this litigation was filed in 1965, pursuant to 42 U.S.C. § 1983. An amended complaint was filed in 1968 alleging that the Milwaukee public school system was unlawfully segregated on the basis of race in violation of the Equal Protection Clause of the Fourteenth Amendment. The trial began in September 1973, and consumed thirty full days on the district court's calendar until its conclusion in January 1974. The parties produced approximately fifty witnesses and hundreds of exhibits during the trial and submitted proposed findings of fact and post-trial briefs after its conclusion. The district court then took the case under advisement.
 
 
 3
 In January 1976, the district court issued its decision and order, finding that the defendants had knowingly and intentionally carried out a systematic program of faculty and student segregation and had created and maintained a dual school system. Amos v. Board of School Directors of the City of Milwaukee, 408 F.Supp. 765, 821 (E.D.Wis.1976). In its decision and order, the district court also certified the litigation as a class action pursuant to Fed.R.Civ.P. 23(b)(2),[1] and appointed counsel for the class. 408 F.Supp. at 771-76.[2] An immediate appeal from the district court's finding of a violation was brought to this court pursuant to 28 U.S.C. § 1292(b).
 
 
 4
 In addition to finding a violation of the Equal Protection Clause, the district court, in its initial decision, also permanently enjoined the defendants from any future acts of racial discrimination and appointed a special master to assist in the formulation of an appropriate remedy. While defendants' appeal was pending, they petitioned the district court to stay enforcement of the permanent injunction and to revoke the appointment of the special master until final resolution of the appeal by this court. In a decision issued in May 1976, the district court declined to stay the injunction, revoke the appointment of the special master or suspend his activities. Armstrong v. O'Connell, 416 F.Supp. 1325, 1344 (E.D.Wis.1976).[3] Soon thereafter, the district court ordered the defendants to begin desegregation of students and faculty pursuant to an interim plan. Armstrong v. O'Connell, 416 F.Supp. 1344 & 1347 (E.D.Wis.1976). The defendants complied with the district court's orders and exceeded the goals established by the court.
 
 
 5
 This court issued its decision affirming the district court's initial finding of a constitutional violation in July 1976. Armstrong v. Brennan, 539 F.2d 625, 637 (7th Cir. 1976). Defendants filed a petition for certiorari in the Supreme Court in December 1976, after unsuccessfully petitioning this court for rehearing and rehearing en banc. While the certiorari petition was pending in the Supreme Court, the district court held further hearings with respect to the adoption of a final desegregation plan for the Milwaukee public schools. In March 1977, the district court issued its final desegregation order, which encompassed both faculty and student body desegregation. Armstrong v. O'Connell, 427 F.Supp. 1377 (E.D.Wis.1977). The defendants appealed from this order, but also began to act in compliance with it.
 
 
 6
 The Supreme Court granted defendants' petition for certiorari in June 1977, and, in a per curiam order, vacated this court's judgment and remanded the case for reconsideration in light of Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) and Dayton Board of Education v. Brinkman, 433 U.S. 406 (1977). Brennan v. Armstrong, 433 U.S. 672, 97 S.Ct. 2907, 53 L.Ed.2d 1044 (1977). On remand from the Supreme Court, this court vacated and remanded both the district court's original liability decision and its final desegregation order. 566 F.2d 1175 (7th Cir. 1977).
 
 
 7
 On remand, the district court allowed the parties to supplement the record with respect to the issue of segregative intent. This supplementation amounted to a hearing consuming twenty-seven days, during which sixty-five witnesses were called and almost 1,000 new exhibits were admitted; the record doubled in size as a result. On the basis of the expanded record, the district court found that the defendants had discriminated against the plaintiffs with segregative intent in violation of the Equal Protection Clause. Armstrong v. O'Connell, 451 F.Supp. 817, 820 (E.D.Wis.1978). Another evidentiary hearing, this one consuming eight days, was then conducted with respect to the present effects of the past segregative acts of the defendants. The district court found that the defendants' violations had had a "pervasive, systemwide impact (requiring) . . . a systemwide remedy encompassing both student population and teacher assignment . . . ." Armstrong v. O'Connell, 463 F.Supp. 1295, 1309 (E.D.Wis.1979). The court did not order any particular remedial action at that time; it instead ordered the parties to submit proposed desegregation plans.[4] Id. at 1310.
 
 
 8
 On March 1, 1977, the plaintiffs and defendants submitted for the court's approval a proposed settlement agreement; the agreement was the product of nine months of negotiations between counsel for both sides. This settlement agreement, which is the subject of this appeal,[5] deals only with desegregation of the student population. A separate faculty desegregation proposal was submitted but not made part of the agreement because an intervening party, the Milwaukee Teachers' Education Association, would not approve its terms. The court held an initial hearing on March 5, 1979, to determine whether the settlement agreement was within the range of possible approval; finding that it was, the court approved a class notice which was sent to all class members on March 14, 1979, and published in five Milwaukee newspapers.[6] The notice informed all class members of their right to appear at the scheduled fairness hearing and of the procedures to be followed in making oral or written objections to the proposal.
 
 
 9
 At the fairness hearing, which was conducted on March 26, 27 and 29, 1979, the district court heard statements from all counsel, received a number of exhibits, and heard testimony from several witnesses and from forty-five class members responding to the notice, most of whom opposed the settlement. On the basis of this information, the district court, after a careful analysis of the factors to be considered in evaluating a class action settlement, entered its order approving the settlement agreement. Armstrong v. Board of School Directors, 471 F.Supp. 800, 813 (E.D.Wis.1979). The intervening class members appeal from this order.[7]
 
 
 10
 On June 11, 1979, the intervening plaintiffs filed a motion in the district court for leave to intervene for the purpose of seeking an order vacating the settlement approval or, alternatively, for the purpose of appealing from that approval. The district court, in an order issued June 20, 1979, denied the motion on the ground that the notice of appeal contemporaneously filed by the intervening plaintiffs had transferred all jurisdiction over the case to this court, thus depriving the district court of jurisdiction to grant the motion. The district court indicated, however, that if it had possessed jurisdiction, it would have permitted intervention for purposes of appeal but would not have vacated the settlement. The intervening class members also appeal from the district court's denial of their motions to intervene.
 
 II
 
 11
 The settlement agreement is published as Appendix A to the district court's decision, 471 F.Supp. 800, 813-20; it is therefore unnecessary to discuss its terms in detail in this opinion. We will, however, briefly describe its most important provisions insofar as they are relevant to our review of the district court's order.
 
 
 12
 The settlement agreement begins with a recital of the protracted history of the Milwaukee school desegregation litigation and a brief explanation of the reasons underlying plaintiffs' and defendants' decision to terminate the dispute through settlement. The first substantive provision of the agreement permanently enjoins the defendants, their successors, officers and agents from discriminating on the basis of race in the operation of the Milwaukee public schools. 471 F.Supp. at 815. The agreement contains one other injunctive provision, which requires that decisions respecting school openings and closings and the location of specialty programs not be made in a racially discriminatory manner. 471 F.Supp. at 818.
 
 
 13
 In addition to the injunctive provisions, the agreement places affirmative obligations upon the defendants in terms of active desegregation of the Milwaukee public schools. Every student in the system is given the right to attend a desegregated school[8] upon request; defendants are required to provide annual written notice of this right to all students. 471 F.Supp. at 815. The defendants also must assign students within the system so that a certain minimum number are enrolled in desegregated schools.[9] This minimum number is derived by means of a formula contained in the agreement and will vary with the system's total and minority enrollment. 471 F.Supp. at 815. Application of the agreement precludes the existence of any all-white schools in Milwaukee; the desegregation formula, however, leaves open the possibility that some all-black schools will persist. The formula does not require that any one-race schools exist and defendants are free to go beyond the order's minimum requirements to eliminate all one-race schools in the Milwaukee public school system. 471 F.Supp. at 816.[10] In addition, the agreement requires that defendants continue to implement the pre-existing "racial balance" transfer system which permits student transfers only where they will enhance the racial balance of the system. 471 F.Supp. at 815, 819-20. In order to ensure the success of the settlement agreement as an educational and social, as well as a legal, venture, the defendants are required to develop and implement a "human relations program for students" which will aid in the achievement of quality education and successful desegregation. 471 F.Supp. at 816.
 
 
 14
 The agreement establishes a procedure whereby the defendants' compliance with its provisions shall be monitored by a United States Magistrate and by a five-member monitoring board appointed to assist him. Individual class members may file complaints of noncompliance with the board; the Superintendent of Schools must respond to such complaints and the monitoring board may investigate further if it finds the response insufficient. The board may recommend to the Magistrate that action be taken on particular complaints. The board and plaintiffs' counsel have the right, upon reasonable notice, to visit any school in the system to determine whether it is in compliance with the terms of the agreement. In addition, the defendants are required to submit periodic reports regarding the racial composition of the Milwaukee public schools. Decisions of the board may be reviewed by the Magistrate with a right of appeal to the district court. The monitoring procedure will remain in effect throughout the full five year duration of the settlement agreement.[11] 471 F.Supp. at 816-18.
 
 
 15
 Finally, the agreement provides for the payment of $550,000.00 in fees and $13,428.11 in expenses to counsel for the named plaintiffs and $300,000.00 in fees and $29,350.00 in expenses to counsel for the absent class members in complete payment for services rendered and expenses incurred in this litigation. 471 F.Supp. at 818-19. The district court readily approved the payments because it was
 
 
 16
 well aware of (counsel's) competence, of the time and labor spent by them, of the magnitude and complexity of this litigation, of the responsibility undertaken by them, of the work performed by them out of court in preparation for court proceedings, and of what they have achieved during this litigation.
 
 
 17
 471 F.Supp. at 811. The court went on to comment that it was
 
 
 18
 satisfied that the amount offered them in settlement of their claim for legal services rendered is less than the Court would have awarded had it been required to decide the issue of fees, but not too small that it will discourage attorneys in the future from undertaking class representation in cases of public interest. Therefore, the Court finds that the portion of the settlement agreement which deals with compensation for plaintiffs' attorneys is fair, reasonable, and adequate under all of the circumstances of this case.
 
 
 19
 Id. at 811. No party to this appeal raises any specific objections to this aspect of the district court's order.
 
 
 20
 The district court carefully considered each of the settlement terms outlined above as well as the strength of plaintiffs' case on the merits, the complexity and expense of further litigation, the opinion of counsel for both sides, and all of the other factors which must be weighed when any class action settlement is presented for approval. We do not understand the intervening plaintiffs to argue that the court somehow misapplied the class action standard; rather, they argue that the class action standard should not have been applied at all. It is to this argument which we direct our primary attention.
 
 III
 
 21
 * It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement. U. S. v. McInnes, 556 F.2d 436, 441 (9th Cir. 1977); Du Puy v. Director, Office of Workers' Compensation Programs, 519 F.2d 536, 541 (7th Cir. 1975), cert. denied, 424 U.S. 965, 96 S.Ct. 1459, 47 L.Ed.2d 732 (1976). In the class action context in particular, "there is an overriding public interest in favor of settlement." Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir. 1977). Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources. Id.
 
 
 22
 Settlement of a class action is not, however, an unmixed blessing. Balanced against the "overriding public interest in favor of settlement" are strong countervailing public policies which counsel against automatic judicial acceptance of such agreements. First and foremost is the fact that most of those whose rights are affected by a class action settlement the members of the class are not involved in its negotiation nor are they present to voice their views in court. The class members must rely upon the representation of the class representatives and class counsel to protect their interests. While this representation is no doubt vigorous in most cases, on occasion the negotiating parties may find that their individual interests can best be served by a settlement which is not in the best interests of the class as a whole. Similarly, class counsel may be persuaded by the prospect of a substantial fee to accept a settlement proposal which leaves the class with less relief than could have been procured through more vigorous negotiation. In such cases, the class members may find that substantial rights have been bargained away in exchange for relief which inures primarily to the benefit of a few class members or class counsel. See In re General Motors Corp. Engine Interchange Litigation, 594 F.2d 1106, 1120 (7th Cir. 1979), cert. denied, --- U.S. ----, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979); Moreland v. Rucker Pharmacal Co., 63 F.R.D. 611, 615 (W.D.La.1974).
 
 
 23
 In addition to this concern with the interests of class members, there is a concern with the interests of the public as a whole. The substantive issues involved in many class actions reflect a broad public interest in the rights to be vindicated or the social or economic policies to be established. In such cases, the ramifications of a settlement can extend far beyond the rights of individual class members. This public interest is present not only in civil rights suits such as the one now before us, but also in such economic litigation as antitrust and consumers' rights actions. Uncritical acceptance of a class action settlement can, therefore, disturb important national policies beyond the immediate impact upon the rights of class members. See Developments in the Law Class Actions, 89 Harv.L.Rev. 1318, 1536-39 (1976).
 
 
 24
 To safeguard the rights of class members and allow consideration of the broader implications of a class action settlement, Rule 23(e) of the Federal Rules of Civil Procedure requires that notice of a proposed settlement be sent to all class members and that judicial approval of settlement offers be procured prior to dismissal of a class action.[12] Rule 23(e) does not specify any particular standard which a settlement must satisfy nor does it provide for a procedure within which settlement proposals should be reviewed. The courts of appeals have required that district court approval of a settlement pursuant to Rule 23(e) be given only where the district court finds the settlement fair, reasonable and adequate. See, e. g., Grunin v. International House of Pancakes, 513 F.2d 114, 123 (8th Cir.), cert. denied, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). A district court's determination that a settlement is fair, reasonable and adequate will be reversed on appeal only upon a clear showing that the court abused its discretion. Dawson v. Pastrick, 600 F.2d 70, 75 (7th Cir. 1979); E. E. O. C. v. American Telephone & Telegraph, 556 F.2d 167, 174 (3d Cir. 1977), cert. denied, 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978).
 
 B
 
 25
 District court review of a class action settlement proposal is a two-step process. The first step is a preliminary, pre-notification hearing to determine whether the proposed settlement is "within the range of possible approval." This hearing is not a fairness hearing; its purpose, rather, is to ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing. Manual for Complex Litigation § 1.46, at 53-55 (West 1977).[13] If the district court finds a settlement proposal "within the range of possible approval," it then proceeds to the second step in the review process, the fairness hearing. Class members are notified of the proposed settlement and of the fairness hearing at which they and all interested parties have an opportunity to be heard. The goal of the fairness hearing is
 
 
 26
 to adduce all information necessary to enable the judge intelligently to rule on whether the proposed settlement is "fair, reasonable, and adequate."
 
 
 27
 Manual for Complex Litigation at 57. On the basis of all information available to him, the trial judge must decide whether or not to approve the proposed settlement.
 
 
 28
 Although review of class action settlements necessarily proceeds on a case-by-case basis, certain factors have been consistently identified as relevant to the fairness determination. The district court's opinion approving the settlement now before us listed these factors:
 
 
 29
 Among the factors which the Court should consider in judging the fairness of the proposal are the following:
 
 
 30
 "(1) ' * * * the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement';
 
 
 31
 "(2) '(T)he defendant's ability to pay';
 
 
 32
 "(3) '(T)he complexity, length and expense of further litigation';
 
 
 33
 "(4) '(T)he amount of opposition to the settlement';"
 
 
 34
 Manual, supra, at 56.
 
 
 35
 Professor Moore notes in addition the factors of:
 
 
 36
 "(1) * * *
 
 
 37
 "(2) Presence of collusion in reaching a settlement;
 
 
 38
 "(3) The reaction of members of the class to the settlement;
 
 
 39
 "(4) The opinion of competent counsel;
 
 
 40
 "(5) The stage of the proceedings and the amount of discovery completed."
 
 
 41
 3B Moore's Federal Practice P 23.80(4) at 23-521 (2d ed. 1978).
 
 
 42
 471 F.Supp. at 804. As the district court noted, the first factor, the strength of plaintiffs' case on the merits balanced against the settlement offer, is generally regarded as the most important. See Grunin v. International House of Pancakes, 513 F.2d 114, 124 (8th Cir.), cert. denied, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); Detroit v. Grinnell Corp., 495 F.2d 448, 455 (2d Cir. 1974). While consideration of this factor will require some evaluation of the merits of the dispute, the district court must refrain from reaching conclusions upon issues which have not been fully litigated. Detroit v. Grinnell Corp., 495 F.2d at 456; Patterson v. Stovall, 528 F.2d 108, 114 (7th Cir. 1976).
 
 
 43
 In making its fairness determination, the district court must not forget that it is reviewing a settlement proposal rather than ordering a remedy in a litigated case. As the Second Circuit noted:
 
 
 44
 The Court must eschew any rubber stamp approval in favor of an independent evaluation, yet, at the same time, it must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case.
 
 
 45
 Detroit v. Grinnell Corp., 495 F.2d 448, 462 (2d Cir. 1974). Nonetheless, the district court must clearly set forth in the record its reasons for approving the settlement in order to make meaningful appellate review possible. Dawson v. Pastrick, 600 F.2d 70, 75-76 (7th Cir. 1979). This is particularly important in civil rights class actions. See, e. g., Bryan v. Pittsburgh Plate Glass Co., 494 F.2d 799, 804 (3d Cir.), cert. denied, 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974) (employment discrimination). Even in such cases, however, the court's reasoning need not be so specific as to amount to a judgment on the merits. Id.
 
 
 46
 Courts of appeals, in reviewing district court approval of class action settlements, engage in an even more limited inquiry than the district court. In determining whether a district court abused its discretion, a court of appeals focuses not on the substantive law governing the claims asserted in the litigation, but on the general principles governing approval of class action settlements. As this court noted in a recent Title VII class action:
 
 
 47
 (W)e must recognize that we are here reviewing the propriety of a settlement and not a judgment rendered after trial. We believe that the issues raised by the intervenor should not be decided on the basis of Title VII law, but rather must be decided on the basis of legal principles regulating judicial review of settlement agreements.
 
 
 48
 Airline Stewards & Stewardesses Ass'n v. American Airlines, Inc., 573 F.2d 960, 963 (7th Cir.), cert. denied, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978). See also Dawson v. Pastrick, 600 F.2d 70, 75 (7th Cir. 1979). Courts of appeals view the facts in the light most favorable to the settlement. Patterson v. Stovall, 528 F.2d 108, 112 (7th Cir. 1976). In addition, they do not focus on individual components of settlements, but rather view them in their entirety in evaluating their fairness. McDonald v. Chicago Milwaukee Corp., 565 F.2d 416, 425 (7th Cir. 1977); Cotton v. Hinton, 559 F.2d 1326, 1331-32 (5th Cir. 1977). Such deference is due the judgment of the district judge because of his familiarity with the litigants, the history of the litigation and the merits of the substantive claims asserted. Ace Heating & Plumbing Co. v. Crane Co., 453 F.2d 30, 34 (3d Cir. 1971).
 
 
 49
 The principles governing district court and court of appeals review of settlement proposals seek to take account of the special concerns implicit in class action settlements while still preserving the essential character of settlement of a lawsuit. Whether the lawsuit being settled is a civil rights class action or a simple two-party contract suit, the essence of a settlement is compromise an abandonment of the usual total-win versus total-loss philosophy of litigation in favor of a solution somewhere between the two extremes. This court has, on more than one occasion, taken note of this essential character, stating that "the essence of a settlement is a bilateral exchange. 'The inherent nature of a compromise is to give up certain rights or benefits in return for others.' " In re General Motors Corp. Engine Interchange Litigation, 594 F.2d 1106, 1135 (7th Cir. 1979) (citation omitted), cert. denied, --- U.S. ----, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979). See also Patterson v. Stovall, 528 F.2d 108, 115 (7th Cir. 1976); McDonald v. Chicago Milwaukee Corp., 565 F.2d 416, 425, 429 (7th Cir. 1977). Because settlement of a class action, like settlement of any litigation, is basically a bargained exchange between the litigants, the judiciary's role is properly limited to the minimum necessary to protect the interests of the class and the public. Judges should not substitute their own judgment as to optimal settlement terms for the judgment of the litigants and their counsel.
 
 IV
 
 50
 * The initial issue with which we are faced on this appeal is whether the principles outlined above governing judicial approval of class action settlements are to be applied in this case or whether the settlement before us must be evaluated according to some more stringent standard of review. The district court applied class action settlement principles to the settlement proposal, found it fair, adequate and reasonable, and thus approved it. The settlement's proponents, of course, argue that the district court acted properly in approving the settlement. The intervenors, on the other hand, argue in effect that, because the district court had already found a constitutional violation with a system-wide impact, the settlement should have been evaluated as if it had been presented for the district court's consideration as a possible remedy in a fully litigated dispute.[14] They go on to assert that the settlement cannot be approved because it stops short of providing the degree and scope of desegregation relief available in school desegregation suits which are litigated to a final conclusion.[15]
 
 
 51
 The underlying question implicit in the intervenors' argument is whether it is possible to "settle" the remedial portion of a school desegregation class action at all. As we noted in Part III, supra, the essence of settlement is a compromise in which both parties relinquish some rights in order to gain benefits which would not otherwise be available or would be available only at the expense of further litigation. The intervenors appear to argue that once liability is established in a school desegregation suit, the plaintiffs may not agree to any compromise as to the remedial portion of the suit; the plaintiffs may not exchange their potential right to a particular remedial plan for other remedies or programs or for a speedy final resolution of the litigation. Such a rule would effectively preclude settlement because, by prohibiting any meaningful compromise as to remedy, it would eliminate the element of exchange which is at the heart of settlement of any litigation. The essence of the intervenors' position seems to be that this element of exchange, while most desirable in purely economic litigation, is inappropriate when rights of constitutional stature are involved.
 
 
 52
 The issue raised by the intervenors appears to be one of first impression in the federal courts. Although resolution of school desegregation controversies by way of settlement or consent decree is not uncommon,[16] our research has uncovered no case in which such a resolution was challenged on the fundamental basis asserted here. However, other varieties of civil rights litigation, particularly employment discrimination class actions, are frequently resolved by settlement and these settlements are often reviewed by courts of appeals. These cases provide a useful analogy in the school desegregation context.
 
 
 53
 Settlement of an employment discrimination class action would seem to raise many of the concerns expressed by the intervenors in this case. Although it is difficult to rank civil rights in terms of importance, it is clear that the rights involved in employment discrimination and school desegregation cases are similar in scope, origin and significance.[17] Despite this fact, in the many court of appeals decisions which review district court approval of settlements in employment discrimination class actions, there are no suggestions that the importance of the substantive rights involved precludes compromise or requires a special standard of review. While the terms of such settlements are to be evaluated by the district courts with particular care, in view of the public policies implicated in these suits, the courts must also keep in mind the policy favoring settlement. Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir. 1977); Mandujano v. Basic Vegetable Products, Inc., 541 F.2d 832, 835-36 (9th Cir. 1976).[18] The appropriate balance between the public policies involved in these civil rights actions and the policy favoring settlement is struck by application of the class action settlement principles described in Part III, supra. District courts regularly apply these principles to employment discrimination settlements and are reversed on appeal only for an abuse of discretion. See, e. g., Dawson v. Pastrick, 600 F.2d 70, 74 (7th Cir. 1979); Pettway v. American Cast Iron Pipe Co., 576 F.2d 1157, 1170 (5th Cir. 1978), cert. denied, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979); Cotton v. Hinton, 559 F.2d 1326, 1329 (5th Cir. 1977). Such settlements may provide for the compromise of some of the remedies potentially available to the plaintiff class as long as the settlement as a whole is fair, reasonable and adequate. See, e. g., Airline Stewards & Stewardesses Ass'n v. American Airlines, 573 F.2d 960, 964 (7th Cir.), cert. denied, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978).[19]
 
 
 54
 The employment discrimination cases cited above persuade us that, despite the importance of the substantive rights of the class members, settlement is an appropriate method of arriving at a school desegregation remedy. While courts should be extremely sensitive to the possibilities for abuse where a compromise of the civil rights of a class is proposed, a blanket prohibition of compromise could result, in many cases, in abandonment of the substantial benefits which can result from voluntary resolution of litigation, without a commensurate increase in the protection accorded the civil rights of the class. Indeed, it appears that school desegregation is one of the areas in which voluntary resolution is preferable to full litigation because the spirit of cooperation inherent in good faith settlement is essential to the true long-range success of any desegregation remedy. Cf. Patterson v. Newspaper & Mail Deliverers' Union, 514 F.2d 767, 771 (2d Cir. 1975), cert. denied, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976) (employment discrimination). Accord Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir. 1977). A remedial decree reached through agreement between the parties may, because of the community cooperation it inspires, more effectively implement the constitutional guarantee of equal protection than a seemingly more stringent court-ordered remedy which the community views as imposed upon it from the outside. See Williamsburg Fair Housing Committee v. New York City Housing Authority, 450 F.Supp. 602, 606 (S.D.N.Y.1978) (fair housing). The observations of the district court in Tate v. Werner, 68 F.R.D. 513 (E.D.Pa.1975), a prisoners' rights class action, are equally appropriate in the school desegregation context:
 
 
 55
 We were well aware of the subtlety of the alleged discrimination and the uncertain efficacy of any relief unless all parties were willing to participate in the Court's decree. Under these circumstances, a settlement . . . presented the most appropriate solution to the controversy.
 
 
 56
 Id. at 521. We are unwilling to forego the potential benefits of settlement of school desegregation cases.[20] The standard of review applied by the district court in this case, when applied flexibly on a case-by-case basis, ensures the maximum protection possible for the rights of class members consistent with the public interest in resolution of such litigation by settlement.
 
 
 57
 As a corollary to the argument that the district court's application of the class action standard was inappropriate in this case, it is urged that this court employ a standard of review more stringent than the usual abuse of discretion standard. The basis for this suggestion is explained by amici as follows:
 
 
 58
 In this case the plaintiffs raise substantial constitutional claims. The case is one of broad public importance and significance. In this regard this case differs substantially from cases where a class of plaintiffs is seeking money damage relief for economic harms suffered in violation of law.
 
 
 59
 Brief of Amici Curiae at 5. This argument misconceives the reasoning which underlies court of appeals deference to district court approval of class action settlements. The abuse of discretion standard is employed not because the courts of appeals consider the economic claims involved in most class actions too insignificant to deserve closer scrutiny, but rather
 
 
 60
 because (the trial judge) is exposed to the litigants, and their strategies, positions and proofs. He is aware of the expense and possible legal bars to success. Simply stated, he is on the firing line and can evaluate the action accordingly.
 
 
 61
 Ace Heating & Plumbing Co. v. Crane Co., 453 F.2d 30, 34 (3d Cir. 1971). The consistent application of the abuse of discretion standard in employment discrimination cases reveals that it is not reserved only for purely economic litigation. See, e. g., E. E. O. C. v. American Telephone & Telegraph, 556 F.2d 167, 174 (3d Cir. 1977), cert. denied, 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978); Pettway v. American Cast Iron Pipe Co., 576 F.2d 1157, 1168-69, 1214 (5th Cir. 1978), cert. denied, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979); Dawson v. Pastrick, 600 F.2d 70, 75-76 (7th Cir. 1979).
 
 
 62
 We can imagine no case in which deference to the judgment of the district court is more appropriate than the present one. This litigation has been before the same district judge for its entire fifteen year history. He has issued hundreds of pages of published opinions, has heard voluminous testimony and reviewed countless documents, and has ruled on a variety of issues ranging from preliminary procedural matters to the substantive merits of the plaintiffs' constitutional claims. His familiarity with the litigants and the litigation is a valuable asset which should not lightly be discarded. In the absence of a showing of exceptional circumstances, we decline to do so. The abuse of discretion standard will govern our review of the district court's approval of the settlement proposal.
 
 B
 
 63
 Despite our resolution of the issues discussed above, we believe that the intervenors' position is not wholly without merit. Their concern that constitutional requirements might be frustrated through the use of settlement agreements in school desegregation class actions is a valid one deserving serious attention. The Eighth Circuit expressed a similar concern in Liddell v. Caldwell, 546 F.2d 768 (8th Cir. 1976), cert. denied, 433 U.S. 914, 97 S.Ct. 2987, 53 L.Ed.2d 1100 (1977), and clearly indicated that a school desegregation plan devised through voluntary means, in that case a consent decree, must attain a certain minimum level of constitutional compliance. Id. at 773-74.[21] A federal court cannot permit an agreement between counsel for the defendants and counsel for the plaintiff class seriously to undercut the constitutional policy requiring desegregation of our nation's schools; this is true even where the class members themselves do not oppose a particular settlement. At the same time, however, the court cannot disregard the desire of the litigants amicably to settle their litigation nor can it ignore the substantial benefits which can accrue to both the class members and the general public from a fair and adequate settlement of a school desegregation controversy.
 
 
 64
 The accommodation of these potentially competing interests can be achieved within the framework of the class action settlement standard. Inherent in this standard are two characteristics which ensure that federal courts reviewing class action settlements will give due consideration to the public interests implicated in the suits before them. First, as has been recognized in employment discrimination cases, while the relative importance of the substantive claims asserted in civil rights class actions does not require abandonment of ordinary settlement principles, it does require that both district courts and courts of appeals apply these principles with particular care and state their reasoning with particular clarity. See, e. g., Bryan v. Pittsburgh Plate Glass Co., 494 F.2d 799, 804 (3d Cir. 1974); Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir. 1977). The strength of the class action settlement standard lies in this flexibility; in applying it a district judge may adjust his inquiry to give constitutional claims the close scrutiny they deserve while still allowing ample room for settlement and compromise. Second, implicit in the class action settlement standard is a requirement that no settlement be approved which either initiates or authorizes the continuation of clearly illegal conduct. Robertson v. National Basketball Ass'n, 556 F.2d 682, 686 (2d Cir. 1977); Grunin v. International House of Pancakes, 513 F.2d 114, 123-24 (8th Cir.), cert. denied, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975).[22] A school desegregation settlement which authorizes clearly unconstitutional behavior is, on its face, neither fair, reasonable nor adequate as required by the class action standard. In applying this principle, however, the court must not decide unsettled legal questions; any illegality or unconstitutionality must appear as a legal certainty on the face of the agreement before a settlement can be rejected on this basis. Robertson, supra, 556 F.2d at 686; Grunin, supra, 513 F.2d at 123-24.
 
 
 65
 Application of the class action settlement standard within these guidelines guarantees that civil rights, and other class action, litigants have reasonable latitude in negotiating a settlement without undercutting important national policies on their way to reaching agreement. Having articulated the relevant principles, we turn now to their application to the case before us.
 
 C
 
 66
 In reviewing for an abuse of discretion the district court's approval of the settlement, the first step is to determine whether the settlement initiates or authorizes any clearly illegal or unconstitutional conduct. The intervenors' brief is sprinkled with references to the constitutional inadequacy of the desegregation plan contained in the settlement agreement. Their objections appear to fall into three specific categories. First, they claim that the settlement plan "did not even purport" to effect the systemwide desegregation required by the finding of a constitutional violation with a systemwide impact. Brief of the Appellants at 14. Second, the settlement plan is said to place impermissible reliance upon voluntary techniques and private choices as the primary means to achieve desegregation. Finally, the fact that the settlement plan would permit the existence of some all-black schools[23] in the Milwaukee public school system is regarded as a constitutionally fatal defect. We will consider each of these objections in turn to determine whether they reveal the kind of clear unconstitutionality which will render a settlement on its face neither fair, reasonable nor adequate.
 
 
 67
 The intervenors' first objection need not detain us long. While it is clear that a finding of a systemwide impact requires a systemwide remedy in a fully litigated school desegregation suit, Dayton Board of Education v. Brinkman, 433 U.S. 406, 420, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 581 (1977), it is not clear that this requirement applies where the remedial portion of a suit is resolved by settlement. We need not address this issue in this case, however, because the settlement plan before us clearly attempts to effect systemwide desegregation. As we read the provisions of the settlement plan, we are hard-pressed to understand the basis for the intervenors' objection. All elementary, junior and senior high schools in the system, with minor exception, are required to achieve certain minimum levels of black enrollment; all students in the system have the right to attend a desegregated school upon request; the racial balance transfer program applies throughout the entire system as does the human relations program; and the agreement's two injunctive provisions are clearly systemwide in operation. The intervenors apparently feel that these measures do not go far enough; however, the probable effectiveness of the measures proposed is an issue completely separate from whether these measures operate on a systemwide level. The plan before us clearly is an effort to effect systemwide desegregation.
 
 
 68
 The district court believed that the settlement would be effective in achieving substantial systemwide desegregation in Milwaukee and found that the persistence of significant racial segregation after implementation of the plan would indicate that the defendants were in violation of the plan and the Fourteenth Amendment. 471 F.Supp. at 809. In light of the fact that there is no constitutional right to a particular level of racial balance, Milliken v. Bradley, 418 U.S. 717, 740-41, 94 S.Ct. 3112, 3125, 41 L.Ed.2d 1069 (1974), we cannot say that the plan is so clearly constitutionally inadequate as to render the settlement invalid on its face.
 
 
 69
 The second objection raised by the intervenors appears plausible on its face. A desegregation plan which relied wholly or primarily upon voluntary techniques to achieve desegregation would be constitutionally inadequate in a fully litigated case in which constitutional violations had been found. However, such is not the plan before us. As we noted earlier in this opinion, while the settlement agreement uses language which suggests that it relies primarily upon voluntary efforts to achieve desegregation, all of the parties to this litigation, other than the intervenors, have understood the agreement to impose an affirmative obligation to desegregate upon the defendants. The district court shared this understanding of the agreement and approved it in light of that understanding. In view of the almost universal acknowledgment of the mandatory effect of the agreement, its slightly ambiguous language does not render it constitutionally infirm.
 
 
 70
 Finally, the intervenors raise the possible continued existence of some one-race schools in the Milwaukee public school system as a constitutional defect requiring reversal of the district court. The intervenors apparently would have us follow Tasby v. Estes, 572 F.2d 1010 (5th Cir. 1978), cert. granted sub nom., Estes v. Metropolitan Branches of Dallas NAACP, 440 U.S. 906, 99 S.Ct. 1212, 59 L.Ed.2d 454 (1979), cert. dismissed, --- U.S. ----, 100 S.Ct. 716, 62 L.Ed.2d 626 (1980).[24] In Tasby, the Fifth Circuit rejected a court ordered desegregation plan which would have resulted in the existence of a substantial number of one-race schools. The court held that such a plan was unacceptable in the absence of specific findings by the district court as to the feasibility of the desegregation techniques approved in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). Tasby, 572 F.2d at 1014-15.
 
 
 71
 We decline to upset the plan before us on the authority of Tasby for a number of reasons. First Tasby deals with a remedial plan ordered by a district court after full litigation, while the plan before us is the result of a settlement. The Fifth Circuit in Tasby instructed the district court as to the proper scope of its inquiry during the remedial portion of school desegregation litigation; it is precisely this portion of the litigation which the parties in the present suit have attempted to avoid through settlement. Tasby thus appears inapplicable to the present case.
 
 
 72
 Second, before a settlement may be rejected because it initiates or authorizes a clearly illegal or unconstitutional practice, prior judicial decisions must have found that practice to be illegal or unconstitutional as a general rule. Robertson v. National Basketball Ass'n, 556 F.2d 682, 686 (2d Cir. 1977); Grunin v. International House of Pancakes, 513 F.2d 114, 123-24 (8th Cir.), cert. denied, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). In Tasby, the Fifth Circuit did not hold that a court ordered desegregation plan which permits some one-race schools must always be rejected; rather, the court held that, on the facts of that case, there was not sufficient justification in the record for the substantial number of one-race schools permitted under the lower court's order. 572 F.2d at 1014-15. Under Tasby, a district court must engage in a careful examination of the particular facts of the case and the feasibility of other desegregation techniques to determine whether there is any justification for the existence of one-race schools. Tasby announces a case-by-case approach to one-race schools rather than a general rule prohibiting them. To have rejected the settlement on this basis, the court below would have been required to rule on legal and factual issues which the parties had chosen not to litigate; such an inquiry is clearly inappropriate in a case resolved by settlement. Robertson, 556 F.2d at 686; Grunin, 513 F.2d at 123-24. Thus, the fact that the plan before us permits one-race schools does not reveal the kind of clear unconstitutionality which would require rejection of the settlement as facially invalid.
 
 
 73
 Finally, a class action settlement is to be evaluated according to the state of the law as of the time it was presented to the district court for approval. Dawson v. Pastrick, 600 F.2d 70, 76 (7th Cir. 1979). At the time this settlement was presented to the court below, Tasby had been decided by the Fifth Circuit and certiorari had been granted. The state of the law as to one-race schools at that time, as at this, was far from clear, and is unlikely to become clear until the Supreme Court addresses the issue. This settlement should not be evaluated on the basis of unsettled legal principles which will only be clarified at some time in the future.[25] This court cannot, in reviewing approval of a settlement, resolve significant unsettled substantive issues without wholly undercutting the settlement process.
 
 
 74
 We conclude that, at the time of the district court's approval of the settlement agreement, the desegregation plan contained in it did not initiate or authorize any clearly unconstitutional activities. The settlement agreement is thus not per se inappropriate. We turn, therefore, to a review of the district court's application of the class action settlement standard to determine whether the court abused its discretion in finding the settlement fair, reasonable and adequate.
 
 D
 
 75
 In reaching its decision to approve the settlement agreement, the district court considered each of the factors identified as relevant in Part III, B, supra, and carefully evaluated the probable effectiveness of the settlement agreement in eliminating the effects of defendants' unconstitutional conduct. 471 F.Supp. at 803-13. The court found that each of the relevant factors supported approval and that the settlement addressed itself to the defendants' constitutional violations and provided the plaintiffs with a fair, reasonable and adequate remedy for them. Id. at 809. As discussed in detail below, our review of the district court's action reveals no abuse of discretion.
 
 
 76
 As the district court noted, the most important factor to be considered in reviewing a class action settlement is the strength of plaintiffs' case on the merits balanced against the relief offered in the settlement. 471 F.Supp. at 804. Closely related to this factor is the complexity, length and expense of further litigation. The district court observed that the granting of certiorari in three school desegregation cases[26] both cast doubt on the strength of plaintiffs' case on the merits and ensured that continued appeals in this litigation would indefinitely delay the imposition of a final desegregation remedy. Id. at 805-06, 811-12. The district court analyzed the relief offered in the settlement at length and found that, when balanced against the uncertain status of the law as to plaintiffs' claims and the probable complexity of any further litigation, it provided relief which was fair, reasonable and adequate. The district court based this conclusion on three aspects of the settlement: (1) although not requiring statistically perfect desegregation, the settlement requires substantial desegregation and permits the parties to achieve greater desegregation if possible; (2) the settlement goes to the heart of the constitutional violations found by the district court by ensuring that no white students can be insulated from attending schools with substantial black enrollments;[27] and (3) every student in the system is given the right to attend a desegregated school upon request, thus protecting the rights of individual class members. The district court's analysis indicated to it that the settlement provides the plaintiff class with substantial relief from the unconstitutional acts of the defendants while securing for the litigants the benefits of a prompt resolution of the suit without further litigation. We cannot say that the district court abused its discretion in finding that the balance of these factors favored settlement.
 
 
 77
 The correctness of the conclusion reached by the district court as to the strength of plaintiffs' case on the merits is further supported by the fact that, under the law as it stood at that time, it was not clear that the plaintiffs, in the event of full litigation, would have been entitled to significantly more relief than the settlement provided. The district court observed that the plaintiffs could claim no right to a particular degree of racial balance, 471 F.Supp. at 806, and that to achieve "the most effective remedy for members of the plaintiff class" the court would be required to include school districts outside the Milwaukee system in the operation of the plan, a step the court did not have the power to order. Id. at 808 n. 2. The court expressed its agreement with the opinion of counsel as to the limitations upon its power to order a remedy:
 
 
 78
 The Court also is persuaded that little more could be achieved through further litigation than is offered in the settlement, and that the settlement is a realistic compromise in view of the status of the law in general and this litigation in particular, the harm that could result and the expense and delay that would result from further litigation, and the presently existing limitations on the Court's power to impose an effective remedy.
 
 
 79
 471 F.Supp. at 812. Thus, it is not at all clear that class counsel sacrificed any established remedial rights of the class in exchange for the benefits conferred by the settlement. At most, counsel negotiated as to whatever rights might be established or clarified by the Supreme Court in the pending school desegregation cases. This conclusion finds support in the brief of the intervening class members filed in this court. While they cite several Supreme Court school desegregation opinions in their attack upon the constitutional adequacy of the settlement, they seem to place special emphasis on Columbus Board of Education v. Penick, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979) and Dayton Board of Education v. Brinkman, 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 666 (1979).[28] Brief of the Appellants at 11, 20-23. As discussed above, however, post-approval changes or clarifications in the law cannot provide a basis for challenging a class action settlement. Dawson v. Pastrick, 600 F.2d 70, 76 (7th Cir. 1979). The fact that counsel or the district court may not have accurately predicted the outcome of pending cases does not amount to an abuse of discretion.[29]
 
 
 80
 One additional fact is relevant to the strength of plaintiffs' case on the merits and the complexity and expense of further litigation. This litigation was settled at a relatively late stage, after a finding of liability and systemwide impact but before imposition of a remedy. The lateness of the settlement might suggest that there was little doubt as to the strength of plaintiffs' case and little reason to fear further complex litigation. While this may be a rational inference in the usual case, it is not so in a school desegregation class action. The remedial portion of a school desegregation case is unlike that of any other variety of litigation and conceivably can surpass the liability portion in terms of complexity and duration. As the Second Circuit noted in a recent school desegregation case:
 
 
 81
 Establishment of liability is but the first step. The precise remedy does not follow logically from the determination of liability, but rather reflects a careful reconciliation of the interests of the many affected members of the community and a choice among a wide range of possibilities. "The nature of the litigation does not lend itself to complete success by one side or the other." Keyes v. School District No. 1, supra, 439 F.Supp. (393) at 400.
 
 
 82
 U. S. & South End Education Committee v. Board of Education of Waterbury, 605 F.2d 573 at 576-77 (2d Cir. 1979). Thus, when a school desegregation suit is settled prior to its remedial portion, a potentially complex and time-consuming segment of the litigation may be avoided. Class counsel did not bargain away a clear right to particular remedial action in exchange for virtually nothing, as the intervenors seem to suggest. Through settlement, counsel avoided the remedial portion of the litigation and possible appeals from the district court's earlier rulings while securing significant relief for the class free from the uncertainty and delay which would have resulted from further litigation.[30] It is difficult to imagine a more appropriate basis for agreeing to a settlement, even a settlement reached at such a late stage of the litigation. The district court considered this and was convinced that it was not being presented with a one-sided bargain, 471 F.Supp. at 806, 811-12; we are similarly persuaded.
 
 
 83
 In addition to evaluating the merits of plaintiffs' case and the probable course of any further litigation, the district court placed great weight on the opinion of counsel for the plaintiffs and defendants. 471 F.Supp. at 811-12. While the court, of course, should not abdicate its responsibility to review a class action settlement merely because counsel support it, the court is entitled to rely heavily on the opinion of competent counsel. Pettway v. American Cast Iron Pipe Co., 576 F.2d 1157, 1215 (5th Cir. 1978), cert. denied, 439 U.S. 115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979); Patterson v. Stovall, 528 F.2d 108, 114 (7th Cir. 1976). The district court expressly noted that it had a high opinion of all counsel involved in the litigation, that they favored the settlement, and that their assessment of the strength of plaintiffs' case and the benefits offered by the settlement was in accord with the court's own views. 471 F.Supp. at 811-12. Counsel for the plaintiff class and counsel for the defendants had been extensively involved in the litigation through virtually all of its history, giving the court ample time to evaluate their competence and the weight to be accorded their opinions. There is no basis for disturbing the district court's finding that this factor favored approval of the settlement.
 
 
 84
 Related to the opinion of counsel are two other factors: (1) the stage of the proceedings and amount of discovery completed and (2) the presence of collusion in reaching the settlement. The stage of the proceedings at which settlement is reached is important because it indicates how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims. As discussed above, settlement of this litigation was reached at a very late stage, after the issues had been clearly identified, liability and impact had been decided, and a massive record had been compiled. The district court found, and we agree, that the litigation had progressed to a point at which counsel and the court were fully capable of evaluating the merits of plaintiffs' case and the probable course of future litigation. 471 F.Supp. at 805 & 806. The district court also recognized the possibility of collusion among counsel in reaching a class action settlement. The court considered the history of this hotly contested litigation and affidavits of counsel describing the negotiating process sufficient proof of the absence of collusion. We note that there is nothing in the record to suggest any other conclusion and that the fees paid to class counsel, without more, will not support an inference of collusion in view of the district court's express finding that the amounts paid were less than the court would have awarded had the issue been presented. 471 F.Supp. at 811.
 
 
 85
 The final factors considered by the district court were the reaction of the class to the settlement and the amount of opposition to the settlement.[31] All named plaintiffs in this action informed the district court that they favored the settlement. At the fairness hearing held to consider the views of class members, forty-five persons appeared and others sent written statements to the court, most to express their dissatisfaction with the settlement.[32] As the court described these objections:
 
 
 86
 The opinions expressed were for the most part thoughtful and informative. They represent the opinion of only a small percentage of the class members, ([33] ) however, and most were somewhat misinformed with respect to the present state of the law in school desegregation cases and in particular to the extent of the power which the court exercises in the case of a settlement and as to the probable effect of the settlement agreement.
 
 
 87
 471 F.Supp. at 812. The presence of objecting class members is a relevant factor, although not dispositive even when many class members object. Bryan v. Pittsburgh Plate Glass Co., 494 F.2d 799, 803 (3d Cir. 1974); Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir. 1977). Similarly, while a district court should be hesitant to infer that the class supports a settlement merely because its members are silent, In re General Motors Corp. Engine Interchange Litigation, 594 F.2d 1106, 1137 (7th Cir. 1979), cert. denied, --- U.S. ----, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979), where this silence is coupled with other indicia of fairness, it provides further support for approval. City of Detroit v. Grinnell Corp., 495 F.2d 448, 462 (2d Cir. 1974).[34] The district court in this case clearly considered the objections voiced by class members, 471 F.Supp. at 812-13, and found that, in view of the relatively small number of objectors and their misconception of the law and probable effect of this settlement, the settlement should be approved. Such a determination was, in view of the record before it, well within the discretion of the district court.
 
 
 88
 Having reviewed the district court's consideration of the factors discussed above, we are convinced that, far from abusing its discretion, the court proceeded with commendable care and fairness in approving a reasonable and equitable settlement of this hotly contested, complex lawsuit. The settlement provides for a desegregation plan which promises to achieve substantial desegregation in the Milwaukee public school system. It guarantees that no student can be compelled to attend a segregated school and that all future decisions concerning the operation of the system are made in a manner which observes the constitutional rights of the plaintiff class. The district court stated that a failure to achieve these goals would indicate that defendants had failed to comply with its order. Such a failure to comply can be detected and dealt with within the settlement's own monitoring and policing framework. The settlement represents a major step in the effort to desegregate the Milwaukee public schools, and, while its effectiveness will be shown only by the passage of time, on its face it bodes well for the future of public school education and community cooperation in Milwaukee.[35]
 
 
 89
 Amici admonish this court to follow the lead of the Fifth Circuit and resist the temptation to approve a possibly inadequate settlement merely to conclude a lengthy lawsuit. We share the concern expressed by the Fifth Circuit and acknowledge the wisdom of its statement:
 
 
 90
 While we deplore contributing further to the seemingly Methuselean duration of this case, "we would not substitute one hour of efficiency for one moment of justice."
 
 
 91
 Pettway v. American Cast Iron Pipe Co., 576 F.2d 1157, 1223 (5th Cir. 1978), cert. denied, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979) (footnote omitted). In this case, however, we are not presented with a choice between an hour of efficiency and a moment of justice. Rather, our inquiry convinces us that we are presented with a resolution which secures both efficiency and justice. In the face of such a resolution, to "contribut(e) further to the seemingly Methuselean duration of this case," would be to sacrifice justice and efficiency without any rational basis. This we decline to do.
 
 V
 
 92
 One final issue requires our attention. The intervening class members argue that the district court erred in denying their motion to intervene in the proceedings below. The district court based its denial on the fact that a notice of appeal had simultaneously been filed in this court, thus depriving the district court of jurisdiction to grant the motion. It is settled in this circuit that the filing of a notice of appeal terminates the jurisdiction of the district court. Elgin Manufacturing Corp. v. Ventfabrics, Inc., 314 F.2d 440, 444 (7th Cir. 1963). A district court has no power to vacate a judgment once a notice of appeal has been filed. Miller v. U. S., 114 F.2d 267, 269 (7th Cir. 1940), cert. denied, 313 U.S. 591, 61 S.Ct. 1114, 85 L.Ed. 1545 (1941). Thus, the district court clearly did not err in denying intervening class members' motion to intervene for the purpose of seeking an order vacating the settlement since the court was without power to enter such an order.
 
 
 93
 The intervening class members moved, in the alternative, for leave to intervene for the purpose of appealing from the district court's approval of the settlement. We need not decide whether the denial of this motion was proper, in view of the fact that the intervenors have been allowed to appeal and no one has contested their right to do so. See Joint Brief for Plaintiffs-Appellees and Defendants-Appellees at 26. Furthermore, their right to appeal exists independent of any motion made in the district court. In Research Corp. v. Asgrow Seed Co., 425 F.2d 1059, 1060 (7th Cir. 1970), this court held that an unnamed class member who appears in response to a Rule 23(e) notice and objects to a settlement has a right to appeal from an adverse judgment. Accord, Pettway v. American Cast Iron Pipe Co., 576 F.2d 1157, 1180 (5th Cir. 1978), cert. denied, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). The disposition of their motion by the district court is therefore irrelevant on this appeal, since it is undisputed that Jeffrey, Christopher and Julie Jackson, through their mother Carolyn, appeared at the fairness hearing and opposed the settlement. The Jacksons were entitled to appeal as of right and have been accorded that right. We can find no reversible error in the district court's rulings.
 
 
 94
 We have considered the arguments raised by the intervening class members on this appeal and find them without merit. Accordingly, the order appealed from is affirmed in all respects.
 
 
 
 *
 Honorable Edward Dumbauld, Senior District Judge for the Western District of Pennsylvania, is sitting by designation
 
 
 [1]
 Rule 23 of the Federal Rules of Civil Procedure provides, in relevant part:
 (a) Prerequisites to Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
 (b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
 (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole;
 Fed.R.Civ.P. 23(a), (b)(2).
 
 
 [2]
 The district court certified the case as a bipartite Rule 23(b)(2) class action. One class consisted of all black pupils then enrolled and those who would in the future become enrolled in the Milwaukee public school system. The second class consisted of all non-black pupils then enrolled and those who would in the future become enrolled in the system. 408 F.Supp. at 775-76. The court appointed two attorneys as class counsel, one to represent the named plaintiffs and the other to represent the unnamed plaintiffs. Id. at 775
 
 
 [3]
 In its May 1976, order, the district court also disposed of defendants' request for a stay of proceedings relative to an award of attorneys' fees, 416 F.Supp. at 1332-35, and their request that the court revoke its appointment of counsel for the absent members of the plaintiff class. 416 F.Supp. at 1340-42
 
 
 [4]
 A court-ordered interim desegregation plan was in effect at this time. The Milwaukee public schools had been operating pursuant to such a plan for three academic years, since the interim orders for the 1976-77 school year had been issued by the district court. Armstrong v. O'Connell, 416 F.Supp. 1344 & 1347 (E.D.Wis.1976). Similar plans were put into effect for the 1977-78 and 1978-79 school years pending final resolution of this dispute. In fact, in its evaluation of the present effects of defendants' segregative acts, the district court focused on the 1975-76 school year because, after that year, the Milwaukee public schools were being desegregated pursuant to the court's orders. 463 F.Supp. 1295, 1305
 
 
 [5]
 Pursuant to the terms of the settlement agreement, the defendants agreed not to appeal from the district court's decisions finding that they had violated the Equal Protection Clause and that the violations had had a systemwide impact requiring a systemwide remedy
 
 
 [6]
 The class notice is reproduced as Appendix B to the district court's opinion approving the settlement agreement. Armstrong v. Board of School Directors, 471 F.Supp. 800, 821-24 (E.D.Wis.1979)
 
 
 [7]
 The notice of appeal filed in this case by the intervening class members indicates that the appeal is taken from the district court's order of May 11, 1979. That order encompasses not only the settlement agreement as to student population desegregation, but also the faculty desegregation remedy ordered by the district court, which was not the subject of a settlement. The intervening class members apparently do not appeal from the faculty desegregation order. The briefs filed in this court raise no specific objections to that order and the "Statement of Issues Presented for Review" in the intervenors' brief makes no mention of it. Indeed, it appears from their brief that the intervenors may not have been aware that a faculty desegregation order had been issued. See Brief of the Appellants at 18-19 n.23. Accordingly, we consider only the district court's approval of the student desegregation settlement properly before us and will not address the faculty desegregation order. The district court's decision with respect to the faculty desegregation remedy is published at 471 F.Supp. 827 (E.D.Wis.1979)
 
 
 [8]
 The agreement defines "desegregated school" as follows:
 A "desegregated" school for purposes of student desegregation is defined as:
 (1) Each elementary or junior high school which has a student population composed of not less than 25% and not more than 60% black students and
 (2) Each senior high school which has a student population composed of not less than 20% and not more than 60% black students.
 
 
 [471]
 F.Supp. at 815
 
 
 [9]
 This section of the settlement agreement speaks in terms of defendants' "good faith" assignment of students to achieve particular desegregation "goals." While this choice of phrasing suggests that the provision is advisory rather than mandatory, the district court clearly considered it mandatory and regarded the prescribed desegregation standards as minimum requirements rather than as mere aspirations. 471 F.Supp. at 809. We also have been informed that "all parties to this action have understood the order to be mandatory." Brief of Amici Curiae at 3. See also Joint Brief of Plaintiffs-Appellees and Defendants-Appellees at 7-8
 
 
 [10]
 Because the formula provided in the settlement agreement depends upon variables such as the total enrollment and the total black enrollment in the Milwaukee public schools, it is difficult to state with any degree of precision what the actual desegregative effect of the agreement will be. The district court recognized this difficulty and published, as Appendix C to its order, 471 F.Supp. at 825, a table presenting the predicted effect of the agreement based upon the projected enrollment in each of the five years during which the agreement will be in effect
 The table presents projections of the minimum, most probable, and maximum percentages of students enrolled in desegregated schools for each year. In each case the maximum desegregation attainable under the agreement is 100%, the most probable exceeds 75%, and the minimum varies from 75% in the first year to approximately 60% in the final year.
 Expert testimony below indicated that the minimum levels are "a realistic impossibility" because the Milwaukee public schools have already exceeded these requirements. To achieve the minimum levels, the defendants would have to reassign "massive numbers" of black students out of schools which are presently desegregated. 471 F.Supp. at 808. Attainment of the maximum levels is similarly unlikely because it would require "a perfect distribution of students within the Milwaukee public school system joined with the assignment of some black students to suburban public school systems." Id. As the district court noted, such a metropolitan area remedy would make good sense and could be voluntarily implemented, but could not be required on the facts in this case. 471 F.Supp. at 808 n.2.
 The court was also concerned with amici curiae's prediction that a substantial percentage of the system's black students could be attending non-desegregated schools by the time of the plan's expiration. The court took note of the possibility that as many as 35% of the system's black students might not be enrolled in desegregated schools in the final year of the agreement. On the basis of expert testimony and other provisions of the agreement, however, the court concluded:
 (T)he dire predictions of amici will not be fulfilled, and, furthermore, . . . their fulfillment would mean that defendants had engaged in conduct violative of the settlement agreement and unlawful under the Fourteenth Amendment to the United States Constitution.
 
 
 [471]
 F.Supp. at 809. See also 471 F.Supp. at 809 n.3
 
 
 [11]
 The settlement agreement is to remain in effect for five full years over and above the three years of court ordered desegregation which have already occurred. Contrary to the suggestion of the intervenors, Brief of the Appellants at 13 n.18, the agreement does not provide for a gradual five-year phase-in of the desegregation requirements; the plan is in full force from the first year to the fifth. See Brief of Amici Curiae at 4-5
 
 
 [12]
 Rule 23(e) provides:
 (e) Dismissal or Compromise. A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.
 Fed.R.Civ.P. 23(e). An identical provision is contained in Rule 23.1, governing shareholders' derivative suits. Fed.R.Civ.P. 23.1.
 
 
 [13]
 As the district court correctly noted, this court has endorsed the concept of a pre-notification determination of "probable cause" to proceed with review of a settlement proposal, 471 F.Supp. 800, 804. In In re General Motors Corp. Engine Interchange Litigation, 594 F.2d 1106 (7th Cir. 1979), cert. denied, --- U.S. ----, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979), we indicated that
 the failure of the trial court to hold a preliminary hearing prior to the mailing of the notice of the proposed settlement is (not) inevitably reversible error. . . . (However,) we believe such a hearing is better practice and the Manual for Complex Litigation recommends it . . . .
 594 F.2d at 1133. We continue to adhere to this view.
 
 
 [14]
 Nowhere in their brief do the intervenors acknowledge that class action settlements are usually reviewed according to a standard different from that applied to orders proposed by the parties to be entered after full litigation. At oral argument, however, intervenors' counsel stated that their position was that once a constitutional violation is found, the remedy must meet the same constitutional standards whether it is the result of settlement or full litigation. In accordance with their view that the procedural context of this appeal is irrelevant, the intervenors' brief never mentions the class action standard and focuses instead upon Supreme Court decisions regarding the appropriate remedial action to be ordered in fully litigated school desegregation cases
 
 
 [15]
 As the intervenors state their position:
 Having made the findings of unconstitutional behavior, the District Court's duty extended beyond the mere issuance of proper sounding conclusions of law, but extended into the realm of using the full range of its equitable powers to accomplish the remedial task. The District Court was required to instruct the defendants that they were to utilize all necessary techniques capable of effecting the desegregation process.
 Brief of the Appellants at 12. See also id. at 14, 18, 21.
 
 
 [16]
 See, e. g., Wright v. Baker County Bd. of Educ., 501 F.2d 131 (5th Cir. 1974); Lee v. Attalla City School System, 588 F.2d 499 (5th Cir. 1979); Liddell v. Caldwell, 546 F.2d 768 (8th Cir. 1976), cert. denied, 433 U.S. 914, 97 S.Ct. 2987, 53 L.Ed.2d 1100 (1977). Although none of these cases address the issue confronting us in this case, all indicate that voluntary resolutions of school desegregation suits can and do occur
 
 
 [17]
 Although most employment discrimination suits are based upon a statute, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., while school desegregation suits are based directly on the Constitution, through 42 U.S.C. § 1983, it is clear that both types of litigation have as their foundation the national policy against invidious discrimination. It is well settled that Title VII "was not intended to incorporate and particularize the commands of the Fifth and Fourteenth Amendments." United Steelworkers v. Weber, 443 U.S. 193, 206 n.6, 99 S.Ct. 2721, 2729 n.6, 61 L.Ed.2d 480 (1979). However, the fact that a Title VII plaintiff need not establish discriminatory intent or state action, as required of his Fourteenth Amendment counterpart, in no way affects the analogous character of the rights at issue in both types of litigation. A primary objective of Title VII is solution of the problem of racial discrimination in employment. Weber, supra, 443 U.S. at 200 - 204, 99 S.Ct. at 2726-28. School desegregation suits seek solution of the same problem in the context of public education. Both varieties of litigation concern the fundamental right to be free of invidious discrimination and therefore stand on a similar footing with respect to the need for judicial scrutiny of settlement proposals
 
 
 [18]
 There is a particularly strong policy in favor of settlement of Title VII class actions because the statute itself emphasizes voluntary conciliation. Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir. 1977). However, as the Fifth Circuit made clear in Cotton, this statutory policy merely augments the already strong judicial policy favoring settlement. Id. at 1330-31. We believe that this judicial policy is an appropriate consideration in school desegregation suits
 
 
 [19]
 In the Airline Stewards case, this court made the following statement with respect to a hypothetical situation where some class members object to a settlement because it does not, in their view, provide sufficient relief:
 It may well be that the minority members of the class will have to forego the full retroactive competitive seniority provided in Franks (Franks v. Bowman Transportation Co., 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444), so that the majority may acquire some benefits and yet avoid the costs and uncertainties of litigation. Such a decision would have to be made on a case-by-case basis.
 573 F.2d at 964-65 n.9.
 
 
 [20]
 In a related context, the Second Circuit recently emphasized the importance of settlement in school desegregation cases. In U. S. & South End Educational Committee v. Bd. of Educ. of Waterbury, 605 F.2d 573 (2d Cir. 1979), the court based its flexible interpretation of the attorneys' fees provision of the Emergency School Aid Act, 20 U.S.C. § 1617, in part upon the need to encourage "compromise or concession" in order to facilitate settlement of the remedial portions of school desegregation cases. 605 F.2d at 576
 
 
 [21]
 The Liddell court was not actually confronted with the issue discussed in the text. Its comments were made in the context of an opinion reversing a district court's refusal to allow objecting class members to intervene to oppose a consent decree in a school desegregation case
 
 
 [22]
 The only cases our research has uncovered which articulate this limitation in this manner are antitrust class actions. However, the principle is clearly implicit in all opinions evaluating class action settlements and seems to underlie the Eighth Circuit's comments in Liddell v. Caldwell, 546 F.2d 768, 773-74 (8th Cir. 1976), cert. denied, 433 U.S. 914, 97 S.Ct. 2987, 53 L.Ed.2d 1100 (1977), discussed in the text, supra
 
 
 [23]
 The briefs refer to "one-race" schools. As noted earlier in this opinion, however, the settlement plan precludes the existence of any all-white schools in the Milwaukee school system; the only one-race schools which can exist must therefore be all-black
 
 
 [24]
 Oral argument in Tasby was held in the Supreme Court on October 29, 1979. On January 21, 1980, a divided Court dismissed the writs of certiorari as improvidently granted
 
 
 [25]
 Indeed, a large incentive for settlement in many cases, including this one, is the desire by both parties to avoid the risks created by uncertainty in the legal standards applicable to the litigation. The granting of certiorari in Tasby and two other cases. Columbus Board of Education v. Penick, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979) and Dayton Board of Education v. Brinkman, 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979), seems to have contributed enough uncertainty to plaintiffs' case to induce class counsel to seek settlement. 471 F.Supp. at 806, 811-12. To allow reevaluation of a settlement on the basis of decisions reached after its approval would undercut this motive for settlement. In addition, since our function is only to determine whether the district court abused its discretion, we must evaluate its actions as of the time of approval and not in light of post-approval changes in the law. Dawson v. Pastrick, 600 F.2d 70, 76 (7th Cir. 1979)
 
 
 [26]
 Brinkman v. Gilligan, 583 F.2d 243 (6th Cir. 1978), cert. granted sub nom. Dayton Board of Education v. Brinkman, 439 U.S. 1066, 99 S.Ct. 28, 58 L.Ed.2d 67 (1979); Penick v. Columbus Board of Education, 583 F.2d 787 (6th Cir. 1978), cert. granted, 439 U.S. 1066, 99 S.Ct. 24, 58 L.Ed.2d 24 (1979); Tasby v. Estes, 572 F.2d 1010 (5th Cir. 1978), cert. granted sub nom. Estes v. Metropolitan Branches of Dallas NAACP, 440 U.S. 906, 99 S.Ct. 1212, 59 L.Ed.2d 454 (1979). The Dayton and Columbus cases have since been decided by the Supreme Court; Tasby has been dismissed
 
 
 [27]
 The essence of the defendants' past unconstitutional conduct was their "practice of insulating white children from having to attend school with large numbers of black children." 471 F.Supp. at 809 (footnote omitted). See also Armstrong v. O'Connell, 451 F.Supp. 817, 866 (E.D.Wis.1978). The settlement agreement provides that there can no longer be any schools in the Milwaukee system "which do not have a significant number of black students." 471 F.Supp. at 809 n. 4. Thus, there will be no public schools in Milwaukee in which white students can be insulated from black students
 
 
 [28]
 As the intervening class members put it:
 (W)e believe that the District Court and parties were proceeding at a time when the firm requirements imposed by Columbus and Dayton II were not anticipated.
 While Appellants do not know for certain, the timing of the negotiated settlement suggests to us that the parties who reached agreement were less prescient than was the District Judge as to the ruling of the Supreme Court in the Dayton II and Columbus cases, and that mistaken notions might have been motive forces. In any event, Appellants are of the view that the language of Columbus and Dayton II makes clear the obligation of a school district such as Milwaukee which, despite the absence of compelling state segregation statutes, was fashioned into a dual system of black and white schools. The duty is to disestablish the dual system.
 Brief of the Appellants at 21-22.
 
 
 [29]
 Amici Curiae concede that the settlement cannot be reviewed on the basis of post-approval changes in the law. They maintain, however, that the settlement is constitutionally inadequate under the law as set out in Milliken v. Bradley, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977). They point to three factors identified in Milliken as controlling in this case: (1) a remedy must be related to the constitutional violation; (2) a remedy must, as nearly as possible, restore the victims to the position they otherwise would have occupied; and (3) courts must take into account the interest of state and local authorities in managing their own affairs. Brief of Amici Curiae at 10-11, quoting Milliken, 433 U.S. at 280-81, 97 S.Ct. at 2757. The first and third factors are not at issue here so Amici focus on the second factor
 We note initially that the Supreme Court in Milliken was addressing itself to a fully litigated school desegregation suit, not one resolved by settlement. Beyond this, however, it appears that the district court found, in effect, that the remedy proposed in the settlement agreement did, as nearly as possible, provide full relief to the plaintiffs. The court expressly observed that further litigation could achieve little more relief for the plaintiffs and that, to achieve maximum desegregation, the court would be required to order a remedy which it did not, in the present posture of the litigation, have the power to order. Keeping in mind that in considering a settlement proposal the district court is to evaluate the parties' claims but not to decide them, Patterson v. Stovall, 528 F.2d 108, 114 (7th Cir. 1976), we cannot say that the lower court abused its discretion in reaching this conclusion as to the degree of relief to which plaintiffs would have been entitled in the event of full litigation, or in concluding that the settlement may have provided virtually the full extent of such relief. Therefore, even if the Milliken standard were applicable to a remedy reached through settlement rather than litigation, we believe that the district court made the required findings and that its findings, while not free from doubt, do not constitute a clear abuse of discretion.
 
 
 [30]
 The complexity and delay possible during this portion of school desegregation litigation is well-illustrated by Tasby v. Estes, 572 F.2d 1010 (5th Cir. 1978), which reversed a district court's remedial order and remanded it with instructions to formulate a new student assignment plan, to justify with specific findings the maintenance of one-race schools, and to include in the order a particular remedy not included before. 572 F.2d at 1018. The desegregation plan on review in Tasby had been ordered by the district court in 1976, 412 F.Supp. 1192 (N.D.Tex.1976), pursuant to a Fifth Circuit opinion reversing and remanding a court ordered plan developed in 1971. 517 F.2d 92 (5th Cir. 1975). The Tasby desegregation plan was brought to the Supreme Court, was argued October 29, 1979, and was dismissed on January 21, 1980. Estes v. Metropolitan Branches of Dallas NAACP, --- U.S. ----, 100 S.Ct. 716, 62 L.Ed.2d 626 (1980). At oral argument in the present case, class counsel characterized the remedial portion of school desegregation litigation as often being "speculative" and indicated that concern with the ultimate outcome of Tasby led, at least in part, to the settlement efforts in this case
 
 
 [31]
 In its initial list of relevant factors, 471 F.Supp. at 804, the district court included the defendants' ability to pay. The district court in fact did not consider this factor, and neither do we, because it is not relevant in this case. Id. at 805
 
 
 [32]
 The district court observed, however, that some of the class members opposed to the settlement took that position because they felt the settlement achieved too much, rather than too little, desegregation. 471 F.Supp. at 812. At oral argument, counsel for the plaintiff class informed us that 8 to 10 of the 45 class members who appeared at the fairness hearing supported the settlement
 
 
 [33]
 We were informed at oral argument that there are presently approximately 92,000 students enrolled in the Milwaukee public school system
 
 
 [34]
 As the Second Circuit stated in Grinnell Corp.:
 Any claim by appellants that the settlement offer is grossly and unreasonably inadequate is belied by the fact that, from all appearances, the vast preponderance of the class members willingly approved the offer. Only twenty objectors appeared from the group of 14,156 claimants.
 The favorable reception of the settlement offer at the hands of both plaintiffs and the individual attorneys who had little or nothing to do with the negotiation of the settlement is strong evidence that the District Court not only failed to abuse its discretion in approving the settlement but fulfilled its obligation in exemplary fashion.
 495 F.2d at 462. While this apparent approval on the part of class members perhaps should not be given as much weight in this, a civil rights action, as in Grinnell Corp., an antitrust action, it nonetheless weighs, however slightly, in favor of approval.
 
 
 [35]
 Class counsel stated at oral argument in this court that the settlement had received substantial support in Milwaukee's black community, and that the district court had been made aware of this support